RALPH E. ARMSTRONG *et al.*, Plaintiffs-Appellees, v. RESOLUTION TRUST CORPORATION, as Receiver for Chillicothe Federal Savings and Loan Association, Defendant-Appellant.

Third District   No. 3—91—0737

Opinion filed August 21, 1992.—Rehearing denied October 8, 1992.

De Haan & Richter, P.C., of Chicago, Gregory S. Bell, of Sutkowski & Washkuhn, Associated, of Peoria, and Christopher Bellatto, of Federal Deposit Insurance Corporation, of Washington, D.C. (Ronald M. DeHaan and Randolph E. Ruff, of counsel), for appellant.

The Leiter Group, of Peoria (Thomas E. Leiter and Sandra J. Birdsall, of counsel), for appellees.

JUSTICE GORMAN delivered the opinion of the court:

Plaintiffs sued a savings and loan association, alleging that fraudulent misrepresentations were made in conjunction with the transfer of some land by plaintiffs to a third party. The jury awarded $1,133,000 and defendant appeals. We reverse.

I. FACTS

On August 8, 1978, Ralph and Rema Armstrong obtained a mortgage from Chillicothe Federal Savings & Loan (Chillicothe Federal) to finance construction of an apartment building. Adjacent to that building was another apartment building which the Armstrongs had financed through Security Savings and Loan Association (Security Savings). By 1983, the apartment complex was losing $25,000 per year. There were unpaid real estate taxes in the amount of $15,000 and the Armstrongs were $5,000 behind in their mortgage payments.

Because of the losses, the Armstrongs decided to sell the two mortgaged buildings and a third adjacent undeveloped tract. They listed the properties with Russell Smith, a real estate agent with the Bob Smith Agency. After initial attempts to sell were fruitless, Smith proposed that the Armstrongs convey the property to a group of local businessmen which Smith would put together. Smith theorized that such a partnership, corporation or trust might be interested in the tax benefits.

On December 2, 1983, Smith presented the Armstrongs with a written offer to purchase pursuant to this plan. On December 3, the Armstrongs made a counteroffer. On December 16, Smith responded with a second offer which was accepted on December 19.

All offers were subject to the condition that Chillicothe Federal and Security Savings would modify their loan agreements to allow the buyer of the property to assume the loan payments. Under the proposals, the mortgages would not be paid off at the time of the sale. Instead, the buyer was to receive title to the land in consideration for its promise to make the mortgage payments. The Armstrongs would also remain liable on the debt. The buyer would pay the past-due taxes and mortgage payments. Both banks subsequently approved the assignment of the mortgages.

At some point prior to closing, both Smith and Walter Giugler, Chillicothe Federal's secretary/manager, advised Ralph Armstrong that he should retain an attorney to represent him in the matter. Nevertheless, plaintiffs never obtained a lawyer.

The closing took place December 31, 1983, at the offices of Chillicothe Federal. The grantee in the three deeds was designated as the First National Bank, as trustee under trust No. 01—77—5616—00—6. When Ralph Armstrong inquired what that was, Giugler stated that it was to keep the identity of the businessmen private and that Smith would be managing the property. Giugler also informed Armstrong that the buyer group was made up of nine local businessmen of good reputation, but did not specifically name them.

Giugler then stated to the Armstrongs, "Ralph, you understand if these guys can't pay this bill, we'll still look to you for the mortgage." Ralph Armstrong acknowledged this fact then responded by saying, "But as I understand it, you will first look to the businessmen, the nine buyers, before you will look to me." Giugler responded "Yes."

The Armstrongs also allege that Giugler represented to the Armstrongs during closing that the individual investors were personally assuming the loans. Giugler denies this. Smith testified that he had previously informed the Armstrongs that the members of the buyer group were never going to be personally liable. The deeds were the only closing documents and make no mention of the investors assuming any personal liability.

During 1984 and 1985, the land trust made payments on the loan. In 1985, the trust decided to end its funding of the apartments because it was losing money. The trust tendered the buildings back to the Armstrongs, but the Armstrongs refused the tender. The buyer group then stopped making payments to Chillicothe Federal and Security Savings.

On May 1, 1986, Chillicothe Federal obtained a confession of judgment against the Armstrongs in the amount of $257,351.43, which it subsequently recorded. Foreclosure proceedings were initiated approx-

imately two years later, but by the time of trial, no foreclosure sale had been held. Meanwhile, on November 24, 1986, Security Savings foreclosed on its mortgage and obtained a deficiency judgment against the Armstrongs in the amount of $24,008.07.

The Armstrongs filed suit against the nine individuals comprising the buyer group on May 27, 1986. On August 5, 1988, the Armstrongs voluntarily dismissed those individuals and joined Chillicothe Federal as a defendant.

On January 10, 1989, the Armstrongs filed their third amended complaint. Count I alleged that Chillicothe Federal, through Giugler, fraudulently made the following two misrepresentations: (1) the members of the buyer group were personally assuming liability on the mortgages; and (2) in the event of default, the bank would first look to the members of the buyer group before seeking payment from the Armstrongs. Counts II and III claimed negligent misrepresentation of fact and breach of duty of good faith, respectively.

In support of these claims, plaintiffs point to the fact that they had previously dealt with Giugler on numerous business deals and held him in high respect. They also point to the fact that Giugler received 25% of the real estate commissions paid as a result of the closing. Giugler received this pursuant to an agreement between himself and Robert Smith, Russell Smith's brother. Robert Smith is also Giugler's brother-in-law and owns the real estate brokerage company. This agreement dates back to 1972 when Giugler sold his partnership in the brokerage business to Robert Smith. The fact that Giugler was financially interested in this transaction was not revealed to plaintiffs. In addition, plaintiffs point out that Giugler had been instrumental in helping them obtain the mortgage initially from Security Savings. Giugler also represented Security Savings' interests at the closing which is the subject of this dispute. In addition, there are allegations that Giugler added some language to the deeds after the Armstrongs had signed them. Giugler was never joined as a defendant in this action.

After this suit was filed, Chillicothe Federal was placed into conservatorship with the Federal Savings and Loan Insurance Corporation. On August 23, 1990, the Resolution Trust Corporation (RTC) was appointed as receiver for Chillicothe Federal. In December 1990, RTC was substituted as the proper party defendant, effective August 23, 1990.

RTC then filed a motion for summary judgment. During the pendency of that motion, the Armstrongs filed a claim with the RTC as required by 12 U.S.C. §1821(d) (Supp. II 1990). RTC argued in its mo-

tion that plaintiffs were first required to exhaust the administrative claims procedure prior to proceeding in the courts. In the alternative, the RTC argued that plaintiffs' cause of action was barred by 12 U.S.C. §1823(e) (Supp. II 1990) and/or by the Supreme Court's ruling in *D'Oench, Duhme & Co v. Federal Deposit Insurance Corp.* (1942), 315 U.S. 447, 86 L. Ed. 956, 62 S. Ct. 676, and its progeny. The circuit court denied that motion on February 15, 1991.

A jury trial was held in late February and early March of 1991. The jury returned a verdict for the plaintiffs on count I and awarded damages of $1,133,000. On June 24, 1991, the RTC disallowed the Armstrongs' administrative claim. The trial court denied RTC's post-trial motion and this appeal followed.

## II. JURISDICTION

RTC's first contention is that the circuit court lacked subject matter jurisdiction to hear this claim. RTC argues that no court had jurisdiction during the pendency of the administrative action. RTC then argues that after the administrative remedies have been exhausted, jurisdiction lies solely in the Federal district court.

In support of its claim, RTC points to 12 U.S.C. §1821(d) (Supp. II 1990), which provides, in pertinent part:

"(6)(A) Before the end of the 60-day period beginning on the earlier of—

(i) the end of the period described in paragraph (5)(A)(i) with respect to any claim against a depository institution for which the Corporation is receiver; or

(ii) the date of any notice of disallowance of such claim pursuant to paragraph (5)(A)(i),

the claimant may request administrative review of the claim in accordance with subparagraph (A) or (B) of paragraph (7) or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).

\* \* \*

(13)(D) Except as otherwise provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has

been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver." 12 U.S.C. §§1821(d)(6)(A), (d)(13)(D) (Supp. II 1990).

The Armstrongs counter with the position that the administrative and judicial remedies can be pursued concurrently. They also cite section 1821(d), which states:

"(5)(F)(ii) Subject to paragraph (12), the filing of a claim with the receiver shall not prejudice any right of the claimant to continue any action which was filed before the appointment of the receiver." 12 U.S.C. §1821(d)(5)(F)(ii) (Supp. II 1990).

These sections are part of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Public Law 101—73, 103 Stat. 183 (FIRREA). Congress passed this legislation in response to the ongoing savings and loan crisis. FIRREA created the RTC, a wholly owned government corporation that essentially took over the role of the FSLIC, to resolve the cases of insolvent or failed thrifts. As part of this act, the RTC was given broad powers, including the power to determine claims and to disallow claims not proven to the receiver's satisfaction. (See 12 U.S.C. §§1821(d)(3)(A), (d)(5)(D) (Supp. II 1990).) Sections 1821(d)(3) through (d)(10) of Title 12 of the United States Code set forth a detailed procedure for the filing, consideration and adjudication of receivership claims against insolvent financial institutions in Federal receivership.

Once a claim has been filed, the receiver has 180 days to investigate and determine whether to allow or disallow the claim. If the claimant is dissatisfied with the receiver's determination, the statute specifically provides two avenues for further relief: administrative review or a *de novo* judicial adjudication of the claim.

RTC argues that all courts are stripped of jurisdiction pending the outcome of its determination of the claim. This question is unsettled.

It is clear that the filing of a claim with the RTC is a mandatory prerequisite to seeking relief in the courts. (*Resolution Trust Corp. v. Mustang Partners* (10th Cir. 1991), 946 F.2d 103, 106.) It is also clear that the courts are empowered to stay a prereceivership action until the RTC has made its determination. *Praxis Properties, Inc. v. Colonial Savings Bank* (3d Cir. 1991), 947 F.2d 49; *Tuxedo Beach Club Corp. v. City Federal Savings Bank* (D.N.J. 1990), 737 F. Supp. 18; but see *Marc Development, Inc. v. Federal Deposit Insurance Corp.* (D. Utah. 1991), 771 F. Supp. 1163 (FDIC denied a stay and claimant

allowed to pursue judicial and administrative remedies simultaneously).

■■ The issue here is whether the mere filing of a claim with the RTC acted to divest the circuit court of subject matter jurisdiction over this case. We hold that it did not.

In passing FIRREA, Congress indicated a strong preference for administrative resolution of claims. The Act creates a comprehensive administrative procedure for adjudicating claims asserted against a failed depository institution. This claims determination procedure enables the RTC to dispose of the bulk of claims against failed institutions expeditiously and fairly without unduly burdening the judicial process. (*Resolution Trust Corp. v. Shoreview Builders, Inc.* (1991), 252 N.J. Super. 408, 599 A.2d 1291.) Accordingly, the courts have been virtually unanimous in holding that the failure to file an administrative claim is an absolute bar to any court's consideration of the issue. (See, *e.g., Meliezer v. Resolution Trust Co.* (3d Cir. 1992), 952 F.2d 879; *Resolution Trust Corp. v. Mustang Partners* (10th Cir. 1991), 946 F.2d 103; *Circle Industries, Division of Nastasi-White, Inc. v. City Federal Savings Bank* (E.D.N.Y. 1990), 749 F. Supp. 447, *aff'd* (2d Cir. 1991), 931 F.2d 7; *Chisim v. Resolution Trust Corp.* (N.D. Ill. 1991), 783 F. Supp. 361; accord 12 U.S.C. §1821(d)(13)(D) (Supp. II 1990) ("Except as otherwise provided *** no court shall have jurisdiction over any claim or action ***").) Filing suit cannot substitute for the claims process.

In cases where the claimant has complied with FIRREA's filing requirement, the courts have generally held that the judicial action can be stayed until the RTC makes its determination. (*Praxis Properties, Inc. v. Colonial Savings Bank* (3d Cir. 1991), 947 F.2d 49; *Tuxedo Beach Club Corp. v. City Federal Savings Bank* (D.N.J. 1990), 737 F. Supp. 18.) By its very nature, a stay does not strip a trial court of jurisdiction. Instead, the court retains jurisdiction but merely refrains from exercising it until the specified event occurs or until the specified time span elapses. After the stay expires or is lifted, the trial court is free to resume proceedings in the cause.

There are two types of stays which would be available to the RTC in a situation such as this. The first type is a 90-day stay, which is available when, as here, the case is pending at the time the RTC is appointed receiver. (12 U.S.C. §1821(d)(12) (Supp. II 1990).) This stay is designed to give the RTC some breathing room to get up to speed with the ongoing litigation. *Praxis Properties*, 947 F.2d at 63.

The second type of stay is not explicitly provided for in FIRREA, but has been implied by the courts. (See, *e.g., Gumowitz v. First Fed-*

*eral Savings & Loan Association* (S.D.N.Y. 1991), 1991 U.S. Dist. Lexis 6670, 1991 WL 84630; *Tuxedo Beach*, 737 F. Supp. at 20.) Under this procedure, the action is stayed until the 180-day determination period has ended, or until the RTC disallows the claim, whichever comes first.

Here, RTC never requested a stay. The only time it raised the issue of plaintiffs' failure to exhaust administrative remedies was in its motion for summary judgment. Plaintiffs agree that RTC would have been entitled to a stay had one been requested. But neither the statute nor the case law requires the trial court *sua sponte* to enter a stay.

Plaintiffs rely on *Marc Development, Inc. v. Federal Deposit Insurance Corp.* (D. Utah. 1991), 771 F. Supp. 1163, for the proposition that administrative and judicial remedies can be pursued simultaneously. In *Marc Development*, the trial court denied the FDIC's request for a stay and allowed the lawsuit to proceed, ruling that the claimant need not exhaust administrative remedies.

RTC argues that this approach is in apparent conflict with the Tenth Circuit's ruling in *Resolution Trust Corp. v. Mustang Partners* (10th Cir. 1991), 946 F.2d 103, which was issued nine days prior to *Marc Development*. In *Mustang Partners*, no claim was filed with the RTC and the Tenth Circuit upheld summary judgment for the receiver, holding that exhaustion was required.

Initially, we note that *Marc Development* is currently on appeal to the Tenth Circuit, and we decline to speculate on the outcome. However, these cases can be reconciled with the instant case.

The rule that we can discern from these cases and others which construe FIRREA is that if a claim is not filed with the RTC as required by FIRREA, then no court has jurisdiction to adjudicate the dispute. Where a claim has been filed, however, the court action should be stayed. To the extent that *Marc Development* holds otherwise, it is an anomaly and against the weight of authority. Where a claim has been filed but the receiver does not request a stay, then the judicial and administrative claims can proceed simultaneously.

This rule is in accord with section 1821(d)(6)(A), which allows a claimant to "continue an action commenced before the appointment of the receiver" after the RTC disallows a claim. (12 U.S.C. §1821(d)(6)(A) (Supp. II 1990).) If the trial court had lost jurisdiction automatically when the claim was filed, there would be no suit left to "continue." The claimant would have to refile such a lawsuit because the suit would have been dismissed. *Marquis v. Federal Deposit Insurance Corp.* (D.N.H. 1991), 779 F. Supp. 6.

We therefore find that, while it may have been preferable for this action to have been stayed, the simultaneous pursuit of the administrative claim does not automatically strip the court of subject matter jurisdiction.

RTC then argues that, regardless of the exhaustion requirement, FIRREA vests Federal courts with exclusive jurisdiction. Plaintiffs argue that State courts have concurrent jurisdiction with the Federal courts.

RTC points to the language in section 1821(d)(6)(A), which states that after the administrative claim is disallowed, the claimant may file suit "in the district or territorial court of the United States *** or the United States District Court for the District of Columbia." (12 U.S.C. §1821(d)(6)(A) (Supp. II 1990).) RTC also argues that FIRREA's legislative history reveals Congress' intent for exclusive Federal jurisdiction. (See H.R. Rep. No. 101—54(I), 101st Cong., 1st Sess., *reprinted in* 1989 U.S. Code Cong. & Admin. News 87.) It is RTC's theory that the fact that the legislative history refers solely to Federal courts as the forum is evidence of Congress' intent for exclusive jurisdiction. *Cf. Valenzuela v. Kraft, Inc.* (9th Cir. 1984), 739 F.2d 434.

Several other cases involving the RTC have been litigated in State court. See, *e.g., Berke v. Resolution Trust Corp.* (1992), 1992 Minn. App. Lexis 318; *Dillon v. Resolution Trust Corp.* (1991), 306 Ark. 173, 811 S.W.2d 765; *Reisig v. Resolution Trust Corp.* (Colo. App. 1991), 806 P.2d 397; *Nob Hill at Welleby, Ltd. v. Resolution Trust Corp.* (Fla. App. 1991), 573 So. 2d 952; *Resolution Trust Corp. v. Whitley* (Mo. App. 1990), 800 S.W.2d 150.

However, at least one State appellate court has held that Federal courts do have exclusive jurisdiction. *Bailey v. First City Bank* (La. App. April 16, 1992), No. 91—CA—0132.

In the *Berke* case, the Minnesota court was faced with the exact same arguments as are present in this case, *i.e.*, failure to exhaust administrative remedies and exclusive Federal jurisdiction. That court expressly found that FIRREA does not preclude State court jurisdiction. We agree.

■ While FIRREA does grant Federal courts original jurisdiction, it does not grant them exclusive jurisdiction. FIRREA's provision that all claims against the RTC shall be deemed to arise under Federal law merely grants Federal courts jurisdiction which they would not otherwise have over many State law issues. This clause, however, does not remove State court jurisdiction over these claims.

The statute contains provisions whereby the RTC can remove cases to Federal court. (12 U.S.C. §1819(b)(2)(B) (Supp. II 1990).) The RTC made no such attempt in this case after being appointed as receiver for Chillicothe Federal. Since FIRREA does not implicitly or explicitly grant exclusive jurisdiction to the Federal courts, nor does the statute mandate removal, we find that the circuit court properly asserted subject matter jurisdiction over this case.

### III. THE *D'OENCH, DUHME* DOCTRINE

RTC's next argument on appeal is that claims such as the Armstrongs' are barred by both Federal statutory and common law. 12 U.S.C. §1823(e) (Supp. II 1990); *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.* (1942), 315 U.S. 447, 86 L. Ed. 956, 62 S. Ct. 676.

*D'Oench, Duhme* involved a situation where the defendant executed a note payable to the bank with the understanding that the note would never be called for payment. When the bank failed, the FDIC demanded payment, at which time it learned of the agreement that the note would never have to be repaid. The Supreme Court held that the defendant could not raise the secret agreement as a defense. In setting forth what is now known as the *D'Oench, Duhme* doctrine, the Court stated:

> "The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled." 315 U.S. at 460, 86 L. Ed. at 963-64, 62 S. Ct. at 681.

Congress later ratified the result in *D'Oench, Duhme* by enacting 12 U.S.C. §1823(e) (Supp. II 1990), which provides:

> "No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 11 [12 U.S.C. §1821], either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution." 12 U.S.C. §1823(e) (Supp. II 1990).

Although *D'Oench, Duhme* and section 1823(e) originally applied only to the FDIC, their protections have since been expanded to both the FSLIC and the RTC. (*Adams v. Madison Realty & Development, Inc.* (3d Cir. 1991), 937 F.2d 845; 12 U.S.C. §1441 (Supp. II 1990).) Moreover, while the *D'Oench, Duhme* rule sweeps somewhat more broadly than does section 1823(e), courts have consistently read them in tandem and thus, in general, cases construing one are equally applicable to cases involving the other. *People ex rel. Hartigan v. Commonwealth Mortgage Corp. of America* (N.D. Ill. 1989), 723 F. Supp. 1258.

■ While the exact extent of the rule is the subject of ongoing dispute, the essence of the *D'Oench, Duhme* doctrine is that no agreement between a borrower and a bank which does not plainly appear on the face of the obligation or in the bank's official records is enforceable against the RTC. *Madison Realty*, 937 F.2d at 852.

One purpose of this rule is to allow bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. (*Langley v. Federal Deposit Insurance Corp.* (1987), 484 U.S. 86, 108 S. Ct. 396, 98 L. Ed. 2d 340.) Often this kind of evaluation must be made "with great speed, usually overnight, in order to preserve the ongoing concern value of the failed bank and avoid an interruption in banking services." (*Gunter v. Hutcheson* (11th Cir. 1982), 674 F.2d 862, 865.) Neither the State banking authorities nor the RTC would be able to make any reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions. (*Langley*, 484 U.S. at 92, 98 L. Ed. 2d at 347, 108 S. Ct. at 401.) The doctrine encourages debtors to memorialize all agreements in writing and reflects the equitable principle that losses incurred as a result of unrecorded arrangements should not fall on deposit insurers, depositors, or creditors but rather upon the person who could have best avoided the loss. *Bartram v. Federal Deposit Insurance Corp.* (1991), 235 Cal. App. 3d 1749, 1 Cal. Rptr. 614.

The *D'Oench, Duhme* doctrine does not require a showing that the party had an intent to defraud. Rather, the doctrine prohibits all secret agreements that tend to make the RTC susceptible to fraudulent arrangements. (*Timberland Design, Inc. v. First Service Bank for*

*Savings* (1st Cir. 1991), 932 F.2d 46, 48.) The *D'Oench, Duhme* doctrine applies where the only element of fault on the part of the borrower was his or her failure to reduce the agreement to writing. *(Bell & Murphy & Associates, Inc. v. Interfirst Bank Gateway* (5th Cir. 1990), 894 F.2d 750, 754.) Thus, the *D'Oench, Duhme* doctrine extends broadly to cover any secret agreement adversely affecting the value of the financial interest that has come within the RTC's control as receiver of a failed financial institution. *Oliver v. Resolution Trust Corp.* (8th Cir. 1992), 955 F.2d 583.

It is against this background that we must examine the plaintiffs' allegations to determine if this cause of action is barred by *D'Oench, Duhme.*

The Armstrongs alleged that Chillicothe Federal made two fraudulent misrepresentations of fact: (1) that the members of the buyer group were personally assuming liability on the mortgages; and (2) in the event of default, that the bank would first look to the members of the buyer group before seeking payment from the Armstrongs. The trial court ruled that the *D'Oench, Duhme* doctrine applies to this transaction to bar recovery on the second alleged misrepresentation, but does not apply to the first alleged misrepresentation. The trial court admitted evidence of the second for the limited purpose of corroborating the first.

Plaintiffs make two arguments to get around *D'Oench, Duhme*: first, they allege that this claim does not revolve around a secret side agreement; and second, they allege that this claim does not diminish the RTC's interest in any asset.

■ Addressing the second contention first, plaintiffs misinterpret the rule. It is well settled that, to be barred, a claim does not have to diminish a specific asset. The *D'Oench, Duhme* doctrine acts to bar claims against the general assets of the bank. *(Bell & Murphy*, 894 F.2d at 753.) The plaintiffs' claim serves to diminish the assets of the RTC by over $1 million. Therefore, we reject the plaintiffs' argument that this does not diminish the assets of the receiver.

The Armstrongs next argue that the statements by Giugler were not an "agreement" within the meaning of section 1823(e). RTC argues that this issue is controlled by *Langley* (484 U.S. 86, 98 L. Ed. 2d 340, 108 S. Ct. 396).

In *Langley*, the FDIC attempted to collect on a promissory note signed by the Langleys. The Langleys defended by alleging that the note had been procured by the bank's misrepresentations concerning the exact size and nature of the property conveyed in the underlying land purchase.

The Langleys' first contention was that the word "agreement" encompasses only an express promise to perform an act in the future. The Court rejected that argument, stating:

"Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme*) or of the truthfulness of a warranted fact." 484 U.S. at 93, 98 L. Ed. 2d at 348, 108 S. Ct. at 402.

■ The Langleys then contended that the word "agreement" in section 1823(e) does not include fraudulent misrepresentations. The Supreme Court disagreed. It held that the doctrine applies even where there is fraud in the inducement of the note, so that the borrower has no active culpability in the matter. In so holding, the Court stated:

"No conceivable reading of the word 'agreement' in §1823(e) could cause it to cover a representation or warranty that is bona fide but to exclude one that is fraudulent." 484 U.S. at 93, 98 L. Ed. 2d at 348, 108 S. Ct. at 402.

Plaintiffs rely on *Vernon v. Resolution Trust Corp.* (11th Cir. 1990), 907 F.2d 1101, for the proposition that the *D'Oench, Duhme* doctrine does not bar tort claims. In *Vernon*, the plaintiffs were stockholders in a failed bank and sought to recover for alleged fraud and securities violations surrounding the issuance of stock by the bank. The Eleventh Circuit held that the stockholders' tort claims were not barred by *D'Oench, Duhme*. Along these same lines is *Astrup v. Midwest Federal Savings Bank* (8th Cir. 1989), 886 F.2d 1057, which held that *D'Oench, Duhme* affords no protection against certain tort claims.

*Vernon* is distinguishable. There, the plaintiffs' suit was not based on an oral side agreement. The claim was simply that they were fraudulently induced to purchase stock in the bank. *Vernon* does imply that tort plaintiffs may sue an insolvent financial institution as general creditors. However, that language was *dicta* to the opinion. Moreover, that reasoning has been repeatedly rejected by other courts. See, *e.g., Bartram v. Federal Deposit Insurance Corp.*, 235 Cal. App. 3d at 1756, 1 Cal. Rptr. at 618; *Twin Construction, Inc. v. Boca Raton, Inc.* (11th Cir. 1991), 925 F.2d 378.

Nor does *Astrup* provide any support for the Armstrongs' position. First, it does not hold that *D'Oench, Duhme* is completely inapplicable to tort claims. It merely held that some tort claims, such as

one for personal injuries to a motorist in a collision with an armored car, are not barred. (*Astrup*, 886 F.2d at 1059-60.) In other words, "torts unrelated to agreements which could have been memorialized in the bank's records are not protected by *D'Oench*. However, the doctrine does not provide blanket tort protection anymore than it bars all breach of contract claims." *Bartram*, 235 Cal. App. 3d at 1757, 1 Cal. Rptr. at 619.

Second, to the extent that *Astrup* does imply that *D'Oench, Duhme* is inapplicable to all tort claims, it, too, has been rejected. (See, *e.g., Bartram*, 235 Cal. App. 3d at 1757, 1 Cal. Rptr. at 619.) As the First Circuit stated, "To allow the plaintiff to assert tort claims based on the oral agreement would circumvent the very policy behind *D'Oench*." (*Timberland Design*, 932 F.2d at 50.) In fact, it appears that the Eighth Circuit has retreated from its position in *Astrup* and adopted the First Circuit's approach in *Timberland Design. Oliver v. Resolution Trust Corp.* (8th Cir. 1992), 955 F.2d 583.

■ The statute is designed to protect against oral representations that could have been expressed as written warranties. Clearly, plaintiffs could have insisted on a written agreement that would have expressly made the individual businessmen liable and avoided the problem. They did not do so. It is well settled that the aggrieved party has the burden of insuring that any side agreements are properly recorded. *Federal Deposit Insurance Corp. v. McCullough* (11th Cir. 1990), 911 F.2d 593.

The Armstrongs also contend that Giugler's alleged alteration of the deed constitutes fraud in factum, which plaintiffs argue takes this case outside the scope of *Langley* and *D'Oench, Duhme*. In *Langley*, the Supreme Court did imply that section 1823(e) would not bar claims based on fraud in factum. *Langley*, 484 U.S. at 93, 98 L. Ed. 2d at 348, 108 S. Ct. at 402.

The language which plaintiffs allege was added is as follows:

"Subject to unpaid general taxes for the years 1981, 1982 and subsequent years.

Subject to the mortgage of Grantors to Chillicothe Federal Savings and Loan Association dated August 9, 1978, which has a current balance of $241,439.73, which Grantee assumes and agrees to pay as part of the consideration heretofore."

■ Even assuming, *arguendo*, that Giugler did add this language after the deeds had been signed, that fact would not help plaintiffs' position. They argue that Giugler added this section to hide his misrepresentations. But this language in no way prejudiced the plaintiffs and in fact probably helped their preforeclosure position by expressly

providing that the trust (the Grantee) was assuming the mortgage. This is not the type of fraud in factum to which the Court alluded in *Langley*. Accordingly, plaintiffs cannot use the alleged alteration of the deeds to avoid the effect of *Langley* and *D'Oench, Duhme*.

Affirmative claims based on secret agreements are barred by *D'Oench, Duhme* just as readily as are defenses. (*Bowen v. Federal Deposit Insurance Corp.* (5th Cir. 1990), 915 F.2d 1013.) Plaintiffs admit that the confession of judgment is valid and that this claim could not act as a defense to that judgment. However, one of the elements of damage they sought and recovered at trial was to pay that judgment and to pay the deficiency judgment owed to Security Savings.

> "To allow a claim against the [RTC] asserting the very grounds that could not be used as a defense to a claim by the [RTC] is to let a technicality stand in the way of principle. Moreover, the effect of such an approach would be to reduce actions Congress has allowed the [RTC] to pursue to nullities since defendants could counterclaim and recover what they lost." *Timberland Design*, 932 F.2d at 49.

Plaintiffs claim that this action is for the "pure tort" of fraudulent misrepresentation and bears no relation to any agreement. That argument ignores the fact that the alleged misrepresentations were made in conjunction with an agreement and are inseparable therefrom. If there had been no agreement, there would have been no misrepresentations. As the Seventh Circuit stated:

> "Lies are representations of the insolvent bank, and to the extent the bank represents that it is bound to act as if its representations were true, it has made an agreement (a warranty) not represented on its books. [Holding] the bank to this unwritten agreement [is] exactly what §1823(e) says may not happen." *Federal Deposit Insurance Corp. v. State Bank* (7th Cir. 1990), 893 F.2d 139, 143.

No matter how this case is styled, plaintiffs are basically trying to avoid damages arising from their default on the mortgage. They are pursuing a tort action based upon an alleged side agreement made at the time of the closing of the sale. Plaintiffs could have protected their interest by insuring that all agreements and understandings were properly memorialized. They did not and now must bear the burden of failing to do so.

While we are not unsympathetic to the plaintiffs' plight, neither section 1823(e) nor *D'Oench, Duhme* and its progeny allow an equitable exception to this sometimes harsh rule. (*Langley*, 484 U.S. at 94, 98 L. Ed. 2d at 349; 108 S. Ct. at 403; *Resolution Trust Corp. v. Mc-*

*Crory* (5th Cir. 1992), 951 F.2d 68.) As the Supreme Court stated in *Langley*:

"While the borrower who has relied upon an erroneous or even fraudulent unrecorded representation has some claim to consideration, so do those who are harmed by his failure to protect himself by assuring that his agreement is approved and recorded in accordance with the statute." 484 U.S. at 94, 98 L. Ed. 2d at 349, 108 S. Ct. at 403.

The trial court correctly ruled that the representation that plaintiffs were only secondarily liable was barred by *D'Oench, Duhme.* However, it incorrectly ruled that plaintiffs' claim was not barred by the *D'Oench, Duhme* doctrine. We therefore reverse the trial court and hold that *D'Oench, Duhme* prevents plaintiffs from asserting this claim against the RTC.

Because we find that the plaintiffs' claim is barred, we need not address the various State law issues that RTC raises.

Accordingly, the judgment of the Peoria County circuit court is reversed.

Reversed.

McCUSKEY and HAASE, JJ., concur.