(Nos. 74592, 74605 cons.—

RALPH E. ARMSTRONG *et al.*, Appellees and Cross-Appellants, v. RESOLUTION TRUST CORPORATION, Appellant and Cross-Appellee.

*Opinion filed September 23, 1993.—Rehearing
denied November 29, 1993.*

Thomas E. Leiter and Sandra J. Birdsall, of The Leiter Group, of Peoria, for appellants and appellees Ralph E. Armstrong *et al.*

Christopher J. Bellotto, of Washington, D.C. (Ann S. Duross, Colleen B. Bombardier, Sheila Kraft Budoff and Robert D. McGillicuddy, of counsel), for appellee and appellant Resolution Trust Corporation.

JUSTICE HEIPLE delivered the opinion of the court:

The current case, while on its face a run-of-the-mill tort action, is one of the multitude of cases which have acquired a complex personality due to the nationwide epidemic of savings and loan failures. This case presents two questions for resolution: (1) whether a State circuit court has concurrent jurisdiction once an administrative claim has been filed with the Resolution Trust Corporation (RTC), and (2) if so, whether the underlying claim in this case is barred under Federal law.

The details of this case are more thoroughly set forth in the opinion below. (234 Ill. App. 3d 162.) We review only those facts necessary for the resolution of this appeal.

### I. FACTS

In August 1978, Ralph and Rema Armstrong obtained a mortgage from Chillicothe Federal Savings & Loan (Chillicothe Federal) to finance construction of an apartment building. In borrowing the money from Chillicothe Federal, the Armstrongs dealt with Walter Guigler, the secretary/manager of Chillicothe Federal. It appears that the Armstrongs had known Guigler since the late 1950s or early 1960s.

Adjacent to the building financed through Chillicothe Federal was another apartment building. The Armstrongs financed this building through Security Savings and Loan Association (Security Savings).

In 1983, because the buildings were running at a deficit, the Armstrongs decided to sell the two mortgaged buildings along with a third adjacent undeveloped tract. On May 31, 1983, the Armstrongs listed the properties with Russell Smith, a real estate agent with the Bob Smith Agency. In November 1983, Russell Smith proposed that the Armstrongs convey the property to a group of local businessmen who might be interested in the tax benefits.

On December 2, 1983, Russell Smith submitted to Ralph Armstrong an offer to purchase. The next day, Ralph Armstrong submitted to Russell Smith a counteroffer. On December 16, 1983, after rejecting Ralph Armstrong's counteroffer, Smith submitted another proposal to purchase which was accepted.

The offer was subject to the condition that Chillicothe Federal and Security Savings would modify their loan agreements to allow the buyer to take over the loan payments. Under the accepted proposal, the mortgages would not be paid off at the time of the sale. Rather, the buyer group was to receive title in consideration for the promise to make the mortgage payments. The Armstrongs would still remain liable on the debt. Ultimately, both banks approved the assumption of the mortgages.

The closing took place in Guigler's office at Chillicothe Federal. Present at the time were Guigler, Bob Smith, and the Armstrongs.

At the closing, Ralph Armstrong noticed that the grantee in the three deeds was designated as the First National Bank as trustee under Trust No. 01—77—5616—00—6. When Ralph Armstrong asked Guigler what was the First National Bank Trust, Guigler stated

that it was to keep the identities of the businessmen private as they did not want to be bothered with management matters at their businesses. Guigler then stated, "Ralph, you understand if these guys can't pay this bill, we'll still look to you for the mortgage." Ralph then said, "But do I understand it right that you will first look to them, to the Buyers?" Allegedly, Guigler responded "Yes." The deeds were the only closing documents and make no mention of the investors assuming any personal liability.

In 1985, the buyers stopped making payments on the loans at Chillicothe Federal and Security Savings because the buildings were losing money. On May 1, 1986, Chillicothe Federal obtained a confession of judgment against the Armstrongs in the amount of $257,351.43. On November 24, 1986, Security Savings foreclosed on its mortgage and obtained a deficiency judgment against the Armstrongs in the amount of $24,008.07.

## II. PROCEEDINGS BELOW

After voluntarily dismissing their suit against the nine individuals of the buyer group, the Armstrongs joined Chillicothe Federal as a defendant. The Armstrongs' third-amended complaint contained three counts. Count I alleged that Chillicothe Federal, through Guigler, fraudulently made misrepresentations that (1) the members of the buyer group were personally assuming liability on the mortgages; and (2) in the event of default, the bank would first look to the members of the buyer group before seeking payment from the Armstrongs. Counts II and III claimed negligent misrepresentation of fact and breach of duty of good faith, respectively.

After this suit was filed, Chillicothe Federal was placed into conservatorship with the Federal Savings and Loan Insurance Corporation. On August 23, 1990,

the RTC was appointed as receiver for Chillicothe Federal. In December 1990, RTC was substituted as the proper party defendant, effective August 23, 1990.

RTC then filed a motion for summary judgment. It argued that plaintiffs were first required to exhaust the administrative claims procedure prior to proceeding in the courts. In the alternative, the RTC argued that plaintiffs' cause of action was barred by 12 U.S.C. §1823(e) (1988) and/or by the Supreme Court's ruling in *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.* (1942), 315 U.S. 447, 86 L. Ed. 956, 62 S. Ct. 676, and its progeny. While this motion was pending, the Armstrongs filed a claim with the RTC as required by 12 U.S.C. §1821(d) (1988).

The circuit court denied the RTC's motion on February 15, 1991, and a jury trial was held in late February and early March of 1991. The jury returned a verdict for the plaintiffs on count I and awarded damages of $1,133,000. On June 24, 1991, the RTC disallowed the Armstrongs' administrative claim and appealed.

At the appellate court, the RTC first argued that the circuit court lacked subject matter jurisdiction. The RTC contended that no court had jurisdiction during the pendency of the administrative action. It argued that after the administrative remedies have been exhausted, jurisdiction lies solely in the Federal district court.

The RTC's second argument was that both Federal statutory and common law barred claims such as the Armstrongs'.

The appellate court found that the circuit court properly asserted subject matter jurisdiction over this case. The appellate court, however, agreed with the RTC and found that plaintiffs' claims were barred by Federal law.

## III. JURISDICTION

On appeal to this court, the RTC argues that the ap-

pellate court erred in finding that the circuit court retained jurisdiction to hear this case. The RTC contends that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) (Pub. L. 101—73, 103 Stat. 183 (codified in scattered sections of 12 U.S.C. (Supp. II 1990))) stripped the State courts of subject matter jurisdiction.

The RTC's argument centers on 12 U.S.C. §1821(d) (Supp. II 1990). This section primarily deals with the RTC's powers and duties when acting as a receiver of a failed financial institution.

In support of its argument, the RTC relies specifically on 12 U.S.C. §1821(d)(13)(D) (Supp. II 1990), which purportedly withdraws jurisdiction from all courts to hear claims against the RTC as receiver, except as provided elsewhere in section 1821(d). Section 1821(d)(13)(D) reads, in pertinent part:

"(D) Limitation on judicial review

Except as otherwise provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver." (12 U.S.C. §1821(d)(13)(D) (Supp. II 1990).)

The RTC argues that section 1821(d)(13)(D) acts as a jurisdictional bar which precludes any judicial action until a claimant has exhausted the administrative claims process.

The RTC asserts that once the administrative claims process is completed, section 1821(d)(6)(A) then removes the jurisdictional bar. Section 1821(d)(6)(A) states that:

"the claimant may request administrative review of the claim in accordance with subparagraph (A) or (B) of paragraph (7) or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)." (12 U.S.C. §1821(d)(6)(A) (Supp. II 1990).)

RTC contends, however, that this section allows administrative review or the pursuit of legal remedies only in Federal district court.

Finally, the RTC argues that application of the test set forth in the United States Supreme Court decision of *Gulf Offshore Co. v. Mobil Oil Corp.* (1981), 453 U.S. 473, 478, 69 L. Ed. 2d 784, 791, 101 S. Ct. 2870, 2875, reinforces its position that State courts do not have concurrent jurisdiction. Under the *Gulf* test, if it is found that there is either: (1) an explicit statutory directive that the Federal courts have exclusive jurisdiction; or (2) an unmistakable implication from the legislative history that Congress intended exclusive Federal jurisdiction; or (3) a clear incompatibility between State-court jurisdiction and Federal interests, the presumption that State courts have concurrent jurisdiction is overcome. The RTC contends that while only one branch of the test need be satisfied, all three are present in this case.

We cannot agree with the RTC's emphatically pressed claims. While the statutory sections quoted by the RTC may support its argument, these sections do not stand alone. A reading of the code that harmonizes all portions of FIRREA argues against the simplistic interpretation that the RTC proposes.

FIRREA is far from being a straightforward and simplistic statute. Indeed, it is a veritable Escher print

set to words, complete with waterfalls that flow backwards. While originally intended to establish a procedure to dispose of the bulk of claims against failed financial institutions expeditiously and fairly, it has instead proven to be extremely nettlesome for courts and litigants alike. Its chaotic overgrowth of sections, subsections, paragraphs, and subparagraphs has caused one court to muse that it "makes the Internal Revenue Code look like a first grade primer." *Guidry v. Resolution Trust Corp.* (E.D. La. 1992), 790 F. Supp. 651, 653.

We begin our analysis with RTC's claim that section 1821 (d)(13)(D) strips jurisdiction from all courts to hear claims against the RTC as receiver until the administrative claims processes have been exhausted. We do not agree. The RTC's interpretation is facially inconsistent with other parts of FIRREA. In particular, the RTC's reading is impossible to harmonize with the section 1821(d)(12)(A) of the act. Section 1821(d)(12)(A) states in relevant part:

"(12) Suspension of legal actions

(A) In general

After the appointment of a conservator or receiver for an insured depository institution, the conservator or receiver may request a stay for a period not to exceed—

(i) 45 days, in the case of any conservator; and

(ii) 90 days, in the case of any receiver, in any judicial action or proceeding to which such institution is or becomes a party." (12 U.S.C. §1821(d)(12)(A) (Supp. II 1990).)

As the United States Court of Appeals for the First Circuit recently noted, it is "difficult to imagine why Congress would have felt a need to provide for stays of pending suits, 12 U.S.C. §1821(d)(12), if such suits were automatically to be dismissed." *Marquis v. Federal Deposit Insurance Corp.* (1st Cir. 1992), 965 F.2d 1148,

1153 (sections 11, 12, and 13 of the Federal Deposit Insurance Act, as amended (12 U.S.C. §§1821, 1822, 1823 (1988)), which are applicable to the Federal Deposit Insurance Corporation, are made applicable to RTC by way of another provision in FIRREA (12 U.S.C. §1441a(b)(4) (1988))); see also *Marc Development, Inc. v. Federal Deposit Insurance Corp.* (10th Cir. 1993), 992 F.2d 1503, 1507 ("federal courts retain subject matter jurisdiction in litigation filed prior to the appointment of the receiver").

Section 1821(d)(5)(F)(ii) further belies the RTC's contention. That subparagraph provides: "Subject to paragraph (12), the filing of a claim with the receiver shall not prejudice any right of the claimant to continue any action which was filed before the appointment of the receiver." (12 U.S.C. §1821(d)(5)(F)(ii) (Supp. II 1990).) "What could be more prejudicial to a claimant's right 'to continue' a pending action than the outright dismissal of the action?" *Marquis*, 965 F.2d at 1153.

Having determined that Congress did not intend to preclude all judicial review before the statutory claims process has been completed, we next address the RTC's contention that State courts do not share concurrent jurisdiction with Federal courts over receivership claims. We disagree with the RTC and affirm the ruling below.

The RTC argues that under *Gulf Offshore Co. v. Mobil Oil Corp.* (1981), 453 U.S. 473, 478, 69 L. Ed. 2d 784, 791, 101 S. Ct. 2870, 2875, Federal jurisdiction should be found to be exclusive. The *Gulf Offshore* test begins with the presumption that State courts enjoy concurrent jurisdiction. This presumption can be rebutted, however, by one of three factors:

    (1) explicit statutory directive; or

    (2) unmistakable implication from legislative history; or

(3) a clear incompatibility between State-court jurisdiction and Federal interests.

The RTC argues that, while only one prong of the *Gulf Offshore* test need be satisfied, all three have been in this case.

The RTC argues that Congress used clear statutory language to designate two specific Federal courts as the exclusive courts to review claims that have been disallowed by the receiver. It relies on section 1821(d)(6)(A), which states that after the administrative claim is disallowed,

"the claimant may request administrative review of the claim in accordance with subparagraph (A) or (B) of paragraph (7) or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located ***." 12 U.S.C. §1821(d)(6)(A) (Supp. II 1990).

While it is indisputable this provision grants Federal courts original jurisdiction over a disputed claim, we are not convinced that Congress intended the Federal courts to maintain exclusive jurisdiction. We find that had Congress intended to grant the sweeping exclusive jurisdiction claimed by RTC, it could have simply done so. That Congress is no novice at granting exclusive jurisdiction when it wants to is demonstrated in other Federal statutes. For example, 28 U.S.C. §1338, relating to patents and copyrights, states:

"The district courts shall have original jurisdiction of any civil action ***. Such jurisdiction shall be exclusive of the courts of the states ***." 28 U.S.C §1338 (1988).

We are similarly unconvinced by RTC's claim that there is an unmistakable implication from the legislative history that Congress intended Federal jurisdiction. While the legislative history indicates a preference for

article III courts if the administrative claim has been pursued to exhaustion, there is no implication whatsoever that Congress intended exclusive Federal jurisdiction in cases which were ongoing in State court prior to the RTC even being appointed. There is no mention, in any of the legislative history cited, of an intent to strip State courts of subject matter jurisdiction as the result of the RTC's stepping in as a receiver of a failed institution. In our minds, silence is not an unmistakable implication.

Finally, we reach the third portion of the *Gulf Offshore* test, which states that the presumption of concurrent jurisdiction is overcome if there is a clear incompatibility between State-court jurisdiction and Federal interests. The RTC argues that exclusive Federal court jurisdiction promotes the Federal interest in prompt, efficient and economical resolution of claims by centralizing the litigation relating to a particular receivership.

We perceive no incompatibility between State-court jurisdiction of pre-receivership claims and Federal interests. There is no inherent detriment or prejudice to the RTC in litigating in State court. Further, we fail to see how it would be more efficient and economical to blindly strip the State court of jurisdiction after potentially lengthy pretrial and trial proceedings have already occurred. That Congress did not intend for the State courts to immediately lose jurisdiction over pre-receivership cases is evidenced in its granting to the RTC the ability to remove claims cases from State to Federal court. (12 U.S.C. §1441a(l) (1988).) This provision leaves the decision up to the RTC as to whether it wishes to litigate pre-receivership cases in Federal court or in State court. Undoubtedly, Congress left this option open just for those cases that have proceeded so far in State court that it would be a waste of the litigants' and the judiciary's resources to start over in Federal court.

For all the foregoing reasons, we find that the appellate court did not err in holding that the trial court retained jurisdiction in this case.

## IV. FRAUDULENT MISREPRESENTATIONS

We now turn to plaintiffs' appeal in this case.

At trial, the Armstrongs alleged that Chillicothe Federal made two fraudulent misrepresentations of fact: (1) that the plaintiffs' apartment loans were being assumed by local businessmen buyers of the property; and (2) in the event of default, that the bank would first look to the members of the buyers group before seeking payment from the Armstrongs. The trial court ruled that the *D'Oench* doctrine (*D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.* (1942), 315 U.S. 447, 86 L. Ed. 956, 62 S. Ct. 676) applied to this transaction to bar recovery on the second alleged misrepresentation, but did not apply to the first alleged misrepresentation.

The appellate court reversed. That court found that the plaintiffs' claims were barred by both 12 U.S.C. §1823(e) (Supp. II 1990) and the *D'Oench* doctrine.

### A. The *D'Oench, Duhme* Doctrine & 12 U.S.C. §1823(e)

The essence of the *D'Oench* doctrine is that the RTC is entitled to rely, to the exclusion of any extraneous matters, on the official bank records that set forth the rights and obligations of the financial institution and those to whom the institution lends money. (*D'Oench*, 315 U.S. at 460, 86 L. Ed. at 963, 62 S. Ct. at 680.) The *D'Oench* doctrine extends broadly to cover any secret agreement adversely affecting the value of the financial interest that has come within the RTC's control as receiver of a failed financial institution. (*Oliver v. Resolution Trust Corp.* (8th Cir. 1992), 955 F.2d 583.) The doctrine protects the Federal banking au-

thorities and the public funds which they administer against unrecorded agreements or misrepresentations of assets. *Langley v. Federal Deposit Insurance Corp.* (1987), 484 U.S. 86, 91-93, 98 L. Ed. 2d 340, 346-48, 108 S. Ct. 396, 401-02.

In 1950, Congress enacted the statutory counterpart to the *D'Oench* doctrine in 12 U.S.C. §1823(e). Section 1823(e) provides that no agreement that tends to diminish or defeat the RTC's interest in any asset acquired by it under this section or section 1821, either as security for a loan or by purchase or as receiver of any insured depository institution shall be valid against the RTC, unless the agreement:

"(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution." 12 U.S.C. §1823(e) (Supp. II 1990).

In applying both *D'Oench* and section 1823(e), the appellate court found that plaintiffs were

"pursuing a tort action based upon an alleged side agreement made at the time of the closing of the sale. Plaintiffs could have protected their interest by insuring that all agreements and understandings were properly memorialized. They did not and now must bear the burden of failing to do so." 234 Ill. App. 3d at 177.

On appeal to this court, the Armstrongs argue that the representations made by the defendant are documented and satisfy both *D'Oench* and section 1823.

Plaintiffs primarily rely on the board of directors' executive committee minutes. These minutes provide:

> "The Secretary presented a request from Bob Smith Agency on offer of ten local business people made to Ralph Armstrong DR #6777—8 to purchase his 12 unit apartment. Offer also includes additional 12-unit adjacent plus vacant land. This would necessitate a partial release of the land from DR #6722—4. Request is to assume the existing 10% interest rate loan in exchange for paying one-half 1982 real estate taxes outstanding, 1983 real estate taxes due, bring loan account current and pay a 1% fee for the assumption right. This would give additional security for the loan and not require a release of original borrowers obligation. Correspondence with Don Korth of Security Savings and Loan of Peoria who holds the mortgage on the adjacent 12-unit apartment, shows they will agree to their loan being assumed under same conditions. Motion was made by Director Stumbaugh and seconded by Director Mullen that the assumption be allowed. Motion passed."

Plaintiffs also point to the contract for the sale of the three parcels of real estate. Plaintiffs find significant that contract language which provided:

> "This contract is further subject to: Buyers being able to assume 1st mtgs at Chillicothe Federal S & L and Security Savings at present rates and one point. Buyer will pay real estate commission due on sale, back taxes and assume responsibility for future taxes."

Plaintiffs contend that the term "Buyers" referred to the individual businessmen buyers.

We find, however, that there are multiple inadequacies to these documents for purposes of satisfying the requirements of section 1823(e). First, neither document requires a bank examiner to conclude that the writings explicitly represented the actual agreement between the parties. The transaction on December 31, 1983, which culminated with the signing of three warranty deeds, superseded both the executive board min-

utes and the real estate contract. In fact, the contract to purchase real estate expired by its own terms prior to December 31, 1983.

In addition to the documents' failure to meet section 1823(e)'s requirement of a written "agreement," the documents are also unexecuted. The committee minutes are not signed by anyone. The contract, while signed by plaintiffs, is not signed by Chillicothe. In the context of section 1823(e)(2), "executed" means that the depository institution has signed the agreement. (*Federal Deposit Insurance Corp. v. O'Neil* (7th Cir. 1987), 809 F.2d 350, 352-54; *Twin Construction, Inc. v. Boca Raton, Inc.* (11th Cir. 1991), 925 F.2d 378, 384.) As there is no executed written agreement, plaintiffs cannot satisfy the requirements of section 1823(e), and that section's unambiguous language bars plaintiffs' suit.

We also find that plaintiffs run afoul of the common law *D'Oench* doctrine. In this case, the RTC possessed a facially unqualified note reflecting the plaintiffs' obligation. By failing to get the alleged agreement to the contrary in writing, the plaintiffs lent themselves to a scheme or arrangement that would tend to deceive bank examiners—the exact evil that the *D'Oench* doctrine was intended to circumvent. *Bell & Murphy & Associates v. Interfirst Bank Gateway, N.A.* (5th Cir. 1990), 894 F.2d 750, 753-54.

Plaintiffs maintain that this case is outside of *D'Oench*, as this was not the case of an undocumented side agreement. They argue that the assumption conditions are recorded in the board minutes. They also argue that because Chillicothe accepted the 1% fee for the assumption right, defendant acknowledged that the loan conditions were satisfied.

We note, however, that there is nothing in the executive board minutes which specifically indicates that

the 10 businessmen referred to would assume individual liability. Moreover, on December 31, 1983, plaintiffs entered into a transaction with Chillicothe, whereby 9 rather than 10 businessmen—as beneficiaries of a land trust—assumed the obligation to make payments on plaintiffs' mortgage note but assumed no personal liability. In light of this subsequent unambiguous document, it is even more difficult for this court to infer that a bank examiner could conclude that the collateral document relied upon by plaintiffs explicitly required the attachment of personal liability to the businessmen. In any event, we agree with the numerous Federal courts which have held that "[n]either section 1823(e) nor *D'Oench* is satisfied by inferences drawn from a bank's records." *Community Bank of the Ozarks v. Federal Deposit Insurance Corp.* (8th Cir. 1993), 984 F.2d 254, 257; *Castleglen, Inc. v. Resolution Trust Corp.* (10th Cir. 1993), 984 F.2d 1571, 1579.

Next, plaintiffs attempt to rely on *Howell v. Continental Credit Corp.* (7th Cir. 1981), 655 F.2d 743, 746, for the proposition that they fall within the limited exception to the application of *D'Oench* and section 1823(e). In *Howell* the Seventh Circuit held that if the bank's records reveal that the bank has agreed to certain additional obligations, then the *D'Oench* doctrine would not preclude a borrower's claim that the bank had not satisfied those additional obligations. (*Howell,* 655 F.2d at 746.) Plaintiffs contend that in the instant case, such additional obligations were fully set forth in the minutes of the defendant's board of directors' executive committee meeting. Plaintiffs vehemently maintain that the RTC's successful use of *D'Oench* and section 1823(e) would give its predecessor the benefits of the assumption transaction but at the same time deny the existence of that assumption.

As stated above, however, we find the minutes to the committee meeting inconclusive as to the extent of the businessmen's individual liability. While we agree that an assumption did take place, we cannot say that the bank's records indicate that the businessmen embraced individual liability. Any benefits of the transaction received by Chillicothe Federal in the form of assumption fees came as the result of the land trust assuming the loan.

The Armstrongs further attempt to support their position that the assumption by the businessmen took place by pointing to the minutes of a September 11, 1985, executive meeting. They argue in their brief that:

> "[t]he fact that an assumption loan existed is further documented in the Board minutes of September 11, 1985, when the Board Executive Committee further modified the assumption loan at the request of third parties without participation from the Armstrongs."

Contrary to the plaintiffs' argument, however, the minutes of this meeting actually weaken their case. The minutes state:

> "The Secretary informed the board that Smith and Associates—account First National Bank of Peoria Land Trust has requested leniency by reduction of loan payments on property at 211-213 Third Street, Chillicothe, Illinois, DR #6777—8 loan."

Far from supporting the plaintiffs' contention that the businessmen individually assumed the loan, these minutes reinforce the position that the land trust, rather than the businessmen, assumed the loan.

### B. Fraud *in Factum*

Finally, plaintiffs contend that the addition of certain language to their warranty deeds, allegedly after plaintiffs signed them, constitutes fraud *in factum*,

which excuses them from the application of *D'Oench* and section 1823(e). Plaintiffs contend that after they signed the warranty deeds, Guigler added the following language to hide his misrepresentations:

"Subject to unpaid taxes for the years 1981, 1982 and subsequent years.

Subject to the mortgage of Grantor to Chillicothe Federal Savings and Loan Association dated August 9, 1978, which has a current balance of $241,439.73, which Grantee assumes and agrees to pay as a part of the consideration herefore."

We find, however, even assuming that the complained of language was added after plaintiffs signed the warranty deeds, the nature of the transaction remained the same. We fail to see how this allegedly added language could have prejudiced the plaintiffs.

## V. CONCLUSION

We agree with the appellate court and find that the trial court had jurisdiction to hear the Armstrongs' pre-receivership claim against Chillicothe Federal. We also agree with the appellate court and find that the appellants' claims were barred by both section 1823(e) and the *D'Oench* doctrine.

The judgment of the appellate court is affirmed.

*Affirmed.*