David SIMARD, Appellant,

v.

RESOLUTION TRUST CORPORATION,
Appellee.

Angela M. PICKETT, Appellant,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Appellee.

Nos. 91–CV–1307, 91–CV–1359.

District of Columbia Court of Appeals.

Argued Dec. 14, 1993.

Decided March 15, 1994.

Edward L. Neveleff, Washington, DC, for appellant in No. 91–CV–1307.

Paul R. Monsees, with whom Denise T. DiPersio and Lloyd N. Fantroy, Washington, DC, were on the brief, for appellee in No. 91–CV–1307.

Richard H. Semsker, Washington, DC, for appellant in No. 91–CV–1359.

S. Alyssa Roberts, Counsel, with whom Ann S. DuRoss, Asst. Gen. Counsel, Richard J. Osterman, Jr., Sr. Counsel, Robert D. McGillicuddy, Deputy Sr. Counsel, Washington, DC, were on the brief, for appellee in No. 91–CV–1359.

Before ROGERS, Chief Judge, and KING and SULLIVAN, Associate Judges.

KING, Associate Judge:

During the preliminary stage of these appeals from grants of summary judgment, both the Resolution Trust Corporation ("the RTC"), appellee in No. 91–CV–1307, and the Federal Deposit Insurance Corporation ("the FDIC"), appellee in No. 91–CV–1359, (collectively referred to as "the receivers") filed motions to dismiss for lack of subject-matter jurisdiction. The motions were denied by a motions division of this court; however, the merits division informed the parties that the issue of subject-matter jurisdiction would be addressed at oral argument.[1] Because the effect of federal legislation relating to failed financial institutions on the subject-matter jurisdiction of this court is common to these appeals, the court, *sua sponte*, has consolidated them for decision. Upon concluding that the court has subject-matter jurisdiction,

---

1. Order of November 19, 1993; *see District of Columbia v. Trustees of Amherst College*, 499 A.2d 918, 920 (D.C.1985) (motions division decisions are not final).

we affirm the grant of summary judgment in both appeals.

## I.

**Appeal No. 91–CV–1307.** On April 25, 1988, appellant David Simard ("Simard") executed an agreement to purchase Unit 426, a condominium located at 4000 Tunlaw Road, N.W., from Dominion Federal Savings and Loan Association ("Dominion Federal").[2] The closing was scheduled for ninety days from the date of the purchase agreement; however, Dominion Federal granted Simard an additional sixty days to clear the title to Unit 426.[3] Thus, by the terms of the purchase agreement, settlement of the property was to occur on or before September 25, 1988. Settlement, however, did not occur by that date.

On June 27, 1989, Simard intervened in a lawsuit filed on December 12, 1988, by Robert W. Ayers II ("Ayers") against Dominion Federal. Ayers was seeking a determination of his statutory right, as an assignee of Edith Rogers, the tenant of Unit 426, to purchase that unit from Dominion Federal. *Ayers v. Dominion Fed. Sav.*, C.A. No. 88–CA11682 (Super.Ct. Dec. 12, 1988). Simard, as intervenor, sought specific performance of his contract for the purchase of Unit 426, injunctive relief, and to quiet title. He filed a motion for partial summary judgment, and the RTC, as conservator, filed a motion for summary judgment, which Simard opposed. In response to the defendant's motion for summary judgment, Simard alleged in his statement of material facts as to which there exists a genuine dispute that he and Trustbank Savings, F.S.B. ("Trustbank Savings"), the successor of Dominion Federal, had extended the date of settlement for the purchase of Unit 426, and that he would settle as soon as Ayers' lawsuit was resolved. In

support of his position, Simard offered evidence of correspondence, dated after the contract settlement date of September 25, 1988, between the bank and himself referring to Simard's pending purchase of Unit 426.

In granting the motion for summary judgment, the motions judge ruled that "the contract had expired by its own terms and that no modification or extension was entered into by the parties sufficient to satisfy the statutory requirements" of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"),[4] specifically as set forth in 12 U.S.C.A. § 1823(e) (1989). The motions judge observed that:

> [a]llowing the modifications would clearly work to "diminish or defeat the right, title or interest" of the RTC. 12 U.S.C. § 1823(e). The RTC took control of Trustbank with the understanding that the contract for the sale of Unit 426 was no longer valid. To allow intervenor to force a sale of the Unit would usurp the legislative purpose in enacting § 1823(e).

**Appeal No. 91–CV–1359.** In June 1989, Angela M. Pickett ("Pickett"), who was then employed at Prosperity Mortgage ("Prosperity") as a "quality control coordinator," contacted Harold Fisher, the president of Theodore Roosevelt National Bank ("TRNB"), about the possibility of employment.[5] Fisher and a senior vice president then interviewed Pickett for the position relating to the establishment and management of TRNB's mortgage department, which would pay an annual salary of $26,000, plus commissions of $100 for each loan closed and one-half point for each loan originated. At that time, TRNB was in the process of organizing itself and was seeking authorization from the Office of the Comptroller of Currency ("OCC") to open as a depository institution. Fisher in-

---

**2.** After Simard noted his appeal, the RTC was appointed receiver of Trustbank Federal, which had purchased the assets of Trustbank Savings, F.S.B., the successor of Dominion Federal.

**3.** When the purchase agreement was executed, Edith Rogers was the tenant of Unit 426. On July 13, 1988, Dominion Federal informed the tenant that she had a right of first refusal to match Simard's offer and to purchase the unit herself. The tenant, however, never responded

to the bank's offer. On November 15, 1988, the tenant purportedly assigned her right to purchase Unit 426 to Robert W. Ayers II.

**4.** Pub.L. 101–73, 103 Stat. 183 (1989) (codified, as amended, in sections throughout 12 U.S.C.A. (1989 & 1994 Supp.)).

**5.** After Pickett noted her appeal, the FDIC was appointed receiver of TRNB.

formed Pickett that TRNB was scheduled to open for business on or about August 14, 1989.

In her deposition, Pickett testified that she sought assurances of job security because joining TRNB would require her to leave a secure position at Prosperity. She testified that Fisher told her "the job was—would be a stable one and there would be a long term, you know, possibility for growth and opportunity." To Pickett, Fisher's representation meant that the job "would exist for [her] unless [she] was terminated for some cause." Fisher, however, testified in his deposition that he and Pickett never discussed the tenure of her employment or the conditions of discharge.

On June 28, 1989, Pickett attended a meeting at TRNB during which she received a letter containing a formal offer of employment as mortgage department manager. The letter set forth a job description, salary, starting date of "approximately August 14, 1989," and explained that her "employment and our opening the bank are contingent upon our final approval from the Office of the Comptroller of Currency." The letter concluded: "we welcome you to the TRNB family and look forward to a long and mutually beneficial relationship." TRNB also provided a blank employment application, which Pickett completed and signed on June 30, 1989. A passage in the conditions of employment section of the application stated: "employment is for no definite period and may, regardless of the date of payment of [her] wages and salary, be terminated at any time without previous notice."

On July 15, 1989, Pickett resigned from Prosperity. She began her employment at TRNB on August 14, 1989, even though it had not yet opened for business. Several months later, Fisher informed Pickett that

he had decided to hire a more experienced manager and that her duties would be adjusted to manage only certain portions of the mortgage department. Although Fisher informed Pickett that she would be paid at the promised rate of salary in the new position, Pickett viewed the reassignment as a demotion, announced her intention to resign, and left TRNB's employment on November 20, 1989. The bank subsequently opened for business in January 1990. On July 13, 1990, Pickett filed a complaint against TRNB and Fisher seeking compensatory and punitive damages arising from her alleged wrongful discharge. Pickett's appeal is from the grant of summary judgment against her.

## II.

We must first determine whether the court has subject-matter jurisdiction. The receivers contend that FIRREA divests a state court of subject-matter jurisdiction after the appointment of a receiver.[6] Specifically, they argue that after the administrative resolution of a claim by the receiver, jurisdiction over a pending action against receivership assets lies exclusively in the federal courts.

### A. Overview of FIRREA's Administrative Claims Procedure

Congress enacted FIRREA to "establish organizations and procedures to obtain and administer the necessary funding to resolve failed thrift cases and to dispose of the assets of these institutions." H.R.REP. No. 101–54(I), 101st Cong., 1st Sess., 307 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 103. FIRREA sets forth an administrative procedure for resolving claims against an insolvent depository institution under receivership with either the RTC or the FDIC.[7] The receiver

---

6. FIRREA is applicable to depository institutions incorporated and operating in the District of Columbia. Once the OCC determines that such an institution is insolvent, a receiver is appointed "for the purpose of liquidation or winding up the affairs of an insured Federal depository institution or District bank by the appropriate Federal banking agency, notwithstanding any other provision of Federal law (other than section 1441a of this title) or the code of law for the District of Columbia." 12 U.S.C.A. § 1821(c)(2)(A)(ii)

(1989). A "District bank" is defined by FIRREA as any bank incorporated and operating under the laws of the District of Columbia. 12 U.S.C.A. § 1813(a) (1989).

7. Although the provisions of FIRREA refer to the FDIC as receiver, they also apply to the RTC. The Federal Home Loan Bank Act, in which the RTC was established, provides that "when [the RTC] is acting as a conservator or receiver of an insured depository institution, [the RTC] shall be

is required to notify a depository institution's creditors that they must present their claims to the receiver within ninety days after receipt of notice in any case involving the liquidation or winding up of a closed depository institution's affairs. 12 U.S.C.A. § 1821(d)(3)(B) (1989). The receiver may request a stay of ninety days in any judicial action then pending. 12 U.S.C.A. § 1821(d)(12)(A) (1989). After the claim is submitted, the receiver has 180 days to determine whether to allow the claim and to notify the claimant of its determination. 12 U.S.C.A. § 1821(d)(5)(A) (1989).

If the claim is disallowed, the receiver's determination becomes final within sixty days after the denial of the claim, unless the claimant (1) seeks administrative review of the claim; (2) files suit in a United States District Court; or (3) "continue[s] an action commenced before the appointment of the receiver." 12 U.S.C.A. § 1821(d)(6) (1989). If the claimant files suit in the district court, the court determines the claim *de novo.* 12 U.S.C.A. § 1821(d)(5)(E) (1989). Neither receiver contends that either appellant has failed to exhaust his or her administrative remedies under FIRREA.[8] *See Marquis v. Federal Deposit Ins. Corp.,* 965 F.2d 1148, 1154 (1st Cir.1992) (FIRREA requires all claimants to comply with its administrative procedures before litigating his or her claim in court).

### B. Jurisdiction After the Exhaustion of Administrative Remedies

▮▮▮ There is a presumption of concurrent jurisdiction among federal and state courts over claims arising under federal law.

*Tafflin v. Levitt,* 493 U.S. 455, 458–59, 110 S.Ct. 792, 794–95, 107 L.Ed.2d 887 (1990); *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 478, 101 S.Ct. 2870, 2875, 69 L.Ed.2d 784 (1981) (citations omitted). This presumption is rebutted only by a clear expression by Congress vesting federal courts with exclusive jurisdiction. *Tafflin, supra,* 493 U.S. at 459, 110 S.Ct. at 795; *Gulf Offshore, supra,* 453 U.S. at 478, 101 S.Ct. at 2875. The Supreme Court has observed that the presumption may be rebutted "by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." *Gulf Offshore, supra,* 453 U.S. at 478, 101 S.Ct. at 2875 (citations omitted).

In support of their contention that federal courts enjoy exclusive subject-matter jurisdiction, the receivers rely on 12 U.S.C.A. § 1821(d)(6)(A) and (d)(13)(D) (1989). Subparagraph (6)(A) provides that after disallowance of a claim by the receiver, a complainant:

may request administrative review of the claim ... or file suit on such claim (or *continue an action* commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).

---

deemed to be an agency of the United States to the same extent as [the FDIC] when [the FDIC] is acting as a conservator or receiver of an insured depository institution." 12 U.S.C.A. § 1441a(b)(1)(B) (1994 Supp.). *See also* 12 U.S.C.A. § 1441a(b)(4)(A) (1994 Supp.) (for purposes relevant in the instant appeal, the RTC has the same powers as the FDIC); H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess., 357 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 153.

**8.** At oral argument, the court directed counsel for both Simard and the RTC to supplement the record with respect to Simard's filing of an administrative claim. The supplemental filings of January 4, 1994, indicate that on May 11, 1992, the RTC informed Simard that any claim against

Trustbank Federal's assets had to be filed by June 20, 1992. On June 19, 1992, Simard filed two claims with the RTC: one sought specific performance of the purchase agreement, and the second, as an alternative, sought contract damages for $56,500. On August 27, 1992, the RTC acknowledged receipt of the claim and requested additional information. As of December 14, 1993, the RTC had not notified Simard of its resolution of the administrative claims.

On June 29, 1992, after summary judgment was entered by the trial court and a notice of appeal was filed, Pickett filed a timely claim with the FDIC. At oral argument, counsel for the FDIC represented that the claim had been disallowed. *See* 12 U.S.C.A. § 1821(d)(5).

12 U.S.C.A. § 1821(d)(6)(A) (emphasis added). The receivers argue that the phrase "continue an action commenced before the appointment of the receiver" modifies the phrase "district or territorial court of the United States" and, therefore, a pending state court action may be continued only by newly filing it in a federal district court.

Subparagraph (13)(D), which addresses judicial review, provides:

> [e]xcept as *otherwise provided* in this subsection, no court shall have jurisdiction over—
>
>> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [RTC or FDIC] has been appointed receiver ... or;
>>
>> (ii) any claim relating to any act or omission of such institution or Corporation as receiver.

12 U.S.C.A. § 1821(d)(13)(D) (emphasis added). The receivers claim that subparagraph (13)(D) is the source of the exclusive grant of federal court jurisdiction.

On the other hand, Simard and Pickett maintain that the "otherwise provided" jurisdiction referred to in 12 U.S.C.A. § 1821(d)(13)(D) is found in 12 U.S.C.A. § 1821(d)(5)(F)(ii) and (d)(6)(A) (1989). Subparagraph (5)(F)(ii) provides that "the filing of a claim with the receiver shall not preju-dice any right of the claimant to continue any action which was filed before the appointment of the receiver." Subparagraph (6)(A), as stated above, provides that, as one option, "the claimant may ... continue an action commenced before the appointment of the receiver."

■ The receivers, disputing the interpretation offered by Simard and Pickett, contend that 12 U.S.C.A. § 1821(d)(13)(D) divests the court of subject-matter jurisdiction and that no other provision of 12 U.S.C.A. § 1821(d) authorizes a state court to exercise jurisdiction. We conclude, however, that FIRREA does not, either explicitly or in its legislative history, rebut the presumption of concurrent jurisdiction over an action that was originally filed in a state trial court (or in the Superior Court of the District of Columbia)[9] before a receiver was appointed. The same result has been reached by the overwhelming majority of the twelve state courts that have decided whether FIRREA divests a state court of subject-matter jurisdiction after the appointment of a receiver.[10]

FIRREA explicitly provides that after exhausting administrative remedies, a claimant may "continue an action commenced before the appointment of the receiver." 12 U.S.C.A. § 1821(d)(6)(A). Courts in other jurisdictions have concluded that a complainant would be unable to "continue" a state

9. *See generally* D.C.Code § 11–901 (1989) and, *supra*, note 6. The receivers do not argue that the District of Columbia courts are not state courts for FIRREA purposes.

10. State courts in nine states have held that FIRREA does not divest state jurisdiction. *See Resolution Trust Corp. v. Foust*, 869 P.2d 183, 190–94 (Ariz.Ct.App.1993); *Connecticut Bank & Trust v. Carriage Lane Ass'n*, 219 Conn. 772, 595 A.2d 334, 338 n. 9 (1991); *Armstrong v. Resolution Trust Corp.*, 234 Ill.App.3d 162, 175 Ill.Dec. 195, 201–02, 599 N.E.2d 1209, 1215–16 (1992), *aff'd*, 157 Ill.2d 49, 191 Ill.Dec. 46, 623 N.E.2d 291 (1993); *Morris v. Resolution Trust Corp.*, 622 A.2d 708, 713–14 (Me.1993); *Botshafter v. Federal Deposit Ins. Corp.*, 33 Mass.App.Ct. 595, 603 N.E.2d 235, 237–39 (1992) *rev'd on other grounds*, 416 Mass. 1004, 621 N.E.2d 1171 (1993); *Berke v. Resolution Trust Corp.*, 483 N.W.2d 712, 714–16 (Minn.Ct.App.1992); *Federal Deposit Ins. Corp. v. Warmann*, 859 S.W.2d 948, 950–51 (Mo.Ct.App.1993); *Resolution Trust*

*Corp. v. Binford*, 114 N.M. 560, 563–67, 844 P.2d 810, 813–17 (1992); *Herbst v. Resolution Trust Corp.*, 66 Ohio St.3d 8, 607 N.E.2d 440, 442–44 (1993). Three state courts have concluded otherwise. *See Resolution Trust Corp. v. Beauchamp Constr. Co.*, 615 So.2d 247, 248–49 (Fla.Dist.Ct. App.1993); *Resolution Trust Corp. v. Shoreview Builders, Inc.*, 252 N.J.Super. 408, 599 A.2d 1291, 1294–95 (App.Div.1991); *Broken Arrow Sav. Ass'n v. Sublett, Sublett & Shafer*, 849 P.2d 1103, 1105–06 (Okla.Ct.App.1993).

In addition, several federal courts have also concluded that the "continue" parenthetical in 12 U.S.C.A. § 1821(d)(6)(A) does not modify the latter part of the sentence; thus, pre-receivership cases continue to be viable actions obviating the need for a claimant to refile. *See, e.g., Marquis, supra*, 965 F.2d at 1153; *Resolution Trust Corp. v. J.F. Assocs.*, 813 F.Supp. 951, 955 (N.D.N.Y. 1993); *McNeily v. United States*, 798 F.Supp. 395, 397–400 (N.D.Tex.1992); *Alberti, Larochelle & Hudson Eng'r Corp. v. First Meridian Group*, 795 F.Supp. 42, 45 (D.Me.1992).

court action if the state court is deprived of subject-matter jurisdiction. Therefore, they conclude that the term "continue" would have no meaning if a litigant was not permitted to resume an action in the state court. *See Armstrong, supra* note 10, 175 Ill.Dec. at 200, 599 N.E.2d at 1214; *Berke, supra* note 10, 483 N.W.2d at 714; *Binford, supra* note 10, 114 N.M. at 566, 844 P.2d at 816; *Herbst, supra* note 10, 607 N.E.2d at 444. In *Berke,* where the state court action was filed before the appointment of the receiver, the Minnesota Court of Appeals held that "we cannot conclude state courts are deprived of all jurisdiction over disputes involving RTC." *Berke, supra* note 10, 483 N.W.2d at 714. The *Berke* court also relied on the "continue" language contained in 12 U.S.C.A. § 1821(d)(6)(A), observing that:

> [s]pecifically, a pre-receivership action filed in state court cannot be "continued" after receivership if it must be dismissed from state court and refiled in federal court. Dismissal of the state court action does not continue that action. Thus, references to which federal courts may entertain [a receivership] action must pertain to suits filed for the first time after the claim has been processed under FIRREA's administrative procedure.

*Id.* at 714 (footnote omitted).

Further support for continuing jurisdiction of pre-receivership claims is found in *Armstrong,* where the RTC, appointed receiver after the state action was filed, moved to dismiss the case on the ground the claimants had failed to exhaust FIRREA's administrative remedies. *Armstrong, supra* note 10, 175 Ill.Dec. at 198, 599 N.E.2d at 1212. The Armstrongs subsequently filed a claim with the RTC while that motion was pending, the trial court denied the motion to dismiss, and the RTC noted an appeal. *Id.* The Illinois Appellate Court held that "the simultaneous pursuit of the administrative claim does not automatically strip the court of subject matter jurisdiction." *Id.* at 201, 599 N.E.2d at 1215. That court further held, citing FIRREA's removal provisions, that "[s]ince FIRREA does not implicitly or explicitly grant exclusive jurisdiction to the federal courts, nor does the statute mandate removal," the state court had subject-matter jurisdiction. *Id.* at 202, 599 N.E.2d at 1216.

On appeal to the Illinois Supreme Court, the RTC contended both that 12 U.S.C.A. § 1821(d)(13)(D) operates as a jurisdictional bar precluding judicial action until administrative remedies have been exhausted and that state courts do not have concurrent jurisdiction pursuant to the test set forth in *Gulf Offshore, supra,* 453 U.S. at 478, 101 S.Ct. at 2875. *Armstrong, supra* note 10, 191 Ill.Dec. at 49, 623 N.E.2d at 294. Concerning the first contention, the Illinois Supreme Court held that "Congress did not intend to preclude all judicial review before the statutory claims process has been completed." *Id.* at 51, 623 N.E.2d at 296. The court explained that it was impossible to reconcile the RTC's interpretation of 12 U.S.C.A. § 1821(d)(13)(D) with FIRREA's stay provisions, observing that if a case was automatically dismissed upon the entry of the receiver as a party then there would be no need for a stay. *Id.* at 50, 623 N.E.2d at 295. The court further observed that such an interpretation would prejudice a claimant's right to continue an action pursuant to 12 U.S.C.A. § 1821(d)(5)(F)(ii). *Id.* at 51, 623 N.E.2d at 296.

The court then held, applying the *Gulf Offshore* test, that federal courts do not have exclusive jurisdiction, observing that there is no exclusive grant of jurisdiction to the federal district courts and that "had Congress intended to grant the sweeping exclusive jurisdiction claimed by RTC, it could have simply done so." *Id.* The court also observed that there is no implication in FIRREA's legislative history that federal courts have exclusive jurisdiction. *Id.* Lastly, the court observed that there is both "no incompatibility between State-court jurisdiction of pre-receivership claims and Federal interests . . . [and] no inherent detriment or prejudice to the RTC in litigating in State court." *Id.* at 52, 623 N.E.2d at 297. Thus, it concluded that "we fail to see how it would be more efficient and economical to blindly strip the State court of jurisdiction after potentially lengthy pretrial and trial proceedings have already occurred." *Id.*

In our view, the receivers' interpretation of 12 U.S.C.A. § 1821(d)(6)(A) would render the "continue" language a nullity because dismissal of the state court action, after exhausting the administrative remedy, followed by a filing in a federal district court is not the more natural meaning of "continuing" the original action that was filed in the state court before appointment of a receiver. Moreover, we agree with the observation of the *Armstrong* court that requiring a claimant to refile an action in federal district court would not advance FIRREA's goal of expeditiously resolving claims against receivership assets. *See id.* That point was also made by the United States Court of Appeals for the First Circuit:

> FIRREA was designed to create an efficient administrative protocol for processing claims against failed banks. This objective would be disserved by forcing the courts to dismiss all pending litigation, only to have the cases filed when and if administrative settlement proved impracticable. It is difficult to conceive of anything less efficient than dismissing a suit that has been, say, two years in process, only to have an identical suit started afresh some six months later.

*Marquis, supra,* 965 F.2d at 1154.

FIRREA also provides that after exhaustion of remedies under the statute, the filing of the claim with the receiver "shall not prejudice any right of the claimant to continue any action which was filed before the appointment of the receiver." 12 U.S.C.A. § 1821(d)(5)(F)(ii). Requiring a claimant to refile in federal court would certainly, at least, prejudice the right to continue the claim in state court. *See generally Warmann, supra* note 10, 859 S.W.2d at 951; *Binford, supra* note 10, 114 N.M. at 565, 844 P.2d at 815; *Herbst, supra* note 10, 607 N.E.2d at 445. "What could be more prejudicial to a claimant's right 'to continue' a pending action than the outright dismissal of the action?" *Marquis, supra,* 965 F.2d at 1153.

Moreover, FIRREA's removal provision supports the conclusion that federal courts do not enjoy exclusive subject-matter jurisdiction over a pre-receivership claim. Congress did not mandate that all state actions be removed to a federal district court. *Herbst, supra* note 10, 607 N.E.2d at 443. Rather, 12 U.S.C.A. § 1819(b)(2)(B) (1994 Supp.) grants the receiver discretion to remove the case to federal court. *Id.* If Congress intended to grant exclusive federal court jurisdiction there would be no need for a provision granting the receiver the right to remove an action to federal court. *See id.* at 444; *Armstrong, supra* note 10, 175 Ill.Dec. at 202, 599 N.E.2d at 1216.

We conclude that the cited provisions of FIRREA, considered together, permit retention of jurisdiction over a pre-receivership, pending action by the state courts, subject only to the receiver's discretion to seek either removal to a federal district court or a stay. *See* 12 U.S.C.A. §§ 1819(b)(2)(B), 1821(d)(12)(A); *see also Hessey v. District of Columbia Board of Elections & Ethics,* 601 A.2d 3, 7 (D.C.1991) (en banc) (court interprets legislative scheme as a whole). Our conclusion that state courts maintain jurisdiction over pre-receivership actions is in accord with Congress' intent to establish "organizations and procedures to ... resolve failed thrift cases and to dispose of the assets of these institutions." H.R.REP. No. 101–54(I), 101st Cong., 1st Sess., 307 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 103. In creating these procedures, Congress intended to expedite the resolution of claims against receivership assets. That goal would be impeded, however, if state courts were automatically divested of subject-matter jurisdiction over an action that was pending before the appointment of the receiver and the claimants were required to refile in a federal court. *Marquis, supra,* 965 F.2d at 1154; *Herbst, supra* note 10, 607 N.E.2d at 445. Under these circumstances, having considered the principles set out in *Tafflin* and *Gulf Offshore,* we hold that 12 U.S.C.A. § 1821(d) does not divest the court of subject-matter jurisdiction over the instant actions that were pending since 1989 and 1990, respectively, before the appointment of the receivers because there is no clear expression in FIRREA, or any implicit direction in its language or legislative history, that subject-matter jurisdiction lies exclusively with the federal dis-

trict courts. Accordingly, we turn to the merits of each appeal.

## III.

■ Summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c). This court must examine the record in the light most favorable to the non-moving party. *Burch v. Amsterdam Corp.*, 366 A.2d 1079, 1081 (D.C.1976) (citations and footnote omitted). The moving party bears the burden of establishing that no genuine issue of material fact exists. *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C. 1979) (citations omitted). "The burden on the non-moving party is 'that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Graff v. Malawer*, 592 A.2d 1038, 1040 (D.C.1991) (quoting *Nader, supra*, 408 A.2d at 48) (citation omitted). On appeal from the trial court's entry of summary judgment, this court conducts a *de novo* review of the record and applies the same principles employed by the trial court in initially considering the motion. *Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983) (citations omitted).

### A.

**Appeal No. 91–CV–1307.** By order of October 3, 1991, the motions judge granted the motion of the RTC for summary judgment against Simard. The motions judge ruled that Simard's contract to purchase Unit 426 had expired, and that any extension was unenforceable against the RTC under 12 U.S.C.A. § 1823(e). We are unpersuaded by Simard's contention that there is a genuine issue of material fact regarding the effect of an alleged oral extension of his purchase agreement on the RTC's interests in Unit 426.

11. There is no exception to the provision for when the FDIC (or the RTC) had prior knowledge of the existence of the claim. *Langley,*

■ In moving for summary judgment, the RTC argued that Simard's contract claim was barred under FIRREA because the oral extension of the contract on which appellant relies is unenforceable under 12 U.S.C.A. § 1823(e), which provides:

> No agreement which tends to diminish or defeat the interest of the [RTC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [RTC] unless such agreement—(1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and, (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e). Thus, 12 U.S.C.A. § 1823(e) sets forth mandatory criteria for agreements that tend to diminish the RTC's interests in any asset in receivership. The statutory provision entitles the RTC to rely, to the exclusion of extraneous materials, on the books and records of a financial institution. *See Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987) (provision designed to protect federal banking authorities and the public funds they administer against unrecorded agreements or misrepresentations of assets).[11]

■ Simard's supplemental argument, filed on January 25, 1994, that summary judgment is inappropriate because the court cannot determine the circumstances under which the RTC's interest would be adversely affected, is unavailing. *See, infra*, note 13. Although the RTC did not expressly argue in its motion for summary judgment that Simard's contract to buy Unit 426 tended to

*supra*, 484 U.S. at 94–95, 108 S.Ct. at 402–03; *see, supra*, note 7.

diminish the RTC's interests in the asset, it relied on 12 U.S.C.A. § 1823(e), which only applies to agreements that are adverse to the RTC's interests. Furthermore, there was evidence of record that Simard's contract price of $79,500 is considerably lower than what he conceded the fair market value to be.[12] Simard's statement of material undisputed facts stated that the fair market value of the unit was in excess of $130,000 and could be as high as $160,000, relying on recent sales of comparable properties. Hence, the motions judge could conclude that there was no genuine issue of disputed fact that the extension of Simard's contract would diminish the RTC's interest.[13] *See* 10A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: Civil 2d § 2721 (1983) ("[t]he court may consider any material that would be admissable or usable at trial" in deciding a summary judgment motion).

In addition, the motions judge could properly conclude that the RTC was entitled to judgment as a matter of law because there was no genuine issue of material fact regarding whether the evidence of the extension of time on which Simard relied met the requirements of 12 U.S.C.A. § 1823(e), quoted *supra*. The RTC asserted in its motion for summary judgment that the contract extension was not reflected in the bank's official records, was not executed by the necessary parties, was not approved by the appropriate people at Trustbank, and was not in writing. Although the RTC did not include such averments in its statement of uncontroverted material facts, nor present them by affidavit, *see*

Super.Ct.Civ.R. 56, Simard has never claimed that the agreement to extend his contract to purchase Unit 426 was in writing. Rather, he has maintained that the agreement to extend was "manifested by the[ ] [parties'] conduct," relying primarily on a November 10, 1988, letter from the bank's counsel indicating that the bank continued to view Simard as entitled to Unit 426 notwithstanding that the time stated in the written contract had passed.[14] Simard maintains that the letter from the bank's counsel is evidence of the agreement to extend his purchase contract and that the letter was part of the official records of the bank. Assuming the letter was part of the bank's official records, it would not be sufficient to meet the requirements of 12 U.S.C.A. § 1823(e). The statute requires the agreement itself to be in writing in order to be enforceable; that there is written evidence of the agreement, signed by counsel for one party, is not sufficient under the express terms of the statute. *See* 12 U.S.C.A. § 1823(e).

Accordingly, because there is no genuine issue as to whether the agreement to extend Simard's purchase contract meets the statutory requirements, summary judgment was properly granted to the RTC.

### B.

**Appeal No. 91–CV–1359.** Pickett contends summary judgment was improper for two separate reasons: TRNB and Fisher (1) breached Pickett's employment contract by demoting her, and (2) should be estopped

---

12. Ayers pointed out in his statement of material factual issues in dispute that there were two different contract prices associated with Simard's contract in the record. There was a contract dated April 18, 1988, for $79,000, and one dated April 25, 1988, for $79,500. In his deposition, Simard testified that the contract price was $79,000. The motions judge noted that such a discrepancy was "inconsequential."

13. The motions judge ruled that allowing the modifications to Simard's contract would "diminish or defeat the right, title, or interest" of the RTC because the RTC took control of the asset with the understanding that Simard's contract to purchase it was void. Thus, the judge reasoned, allowing Simard to force a sale based on the contract terms without the RTC's awareness of the modifications would usurp the legisla-

tive purpose behind 12 U.S.C.A. § 1823(e). The motions judge did not address whether Simard's contract price would adversely affect the RTC's interest in the unit. Nonetheless, the court can uphold the grant of summary judgment on different grounds than the trial court. *See Holland, supra,* 456 A.2d at 814 (review is *de novo*); 6 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.27[1] (2d ed. 1985).

14. The letter dated November 10, 1988, to Simard from the bank's counsel stated, in part, "I have been asked to do a Notice for Personal Use and Occupancy as you are buying this property for your personal use." Simard also relies on a letter that he wrote to a bank official on February 16, 1989, which Simard claims referred to a decorator's agreement.

from denying they had not promised the mortgage department manager position for a fixed period.

### 1. The Breach of Contract Claim

Pickett contends the motions judge erred in finding that there was no evidence upon which a jury could conclude that her employment as the mortgage department manager at TRNB was for a fixed period, and that she could be terminated from the position only for cause.

█ The motions judge found that Pickett's "subjective conclusions ... contradict her signed employment application which provided that the defendants could 'terminate [her] at any time without previous notice' ... [and] her deposition testimony that defendants' never said that her job 'would last for any specific period of time.'" Pickett received the blank employment application when she received the letter offering her the position at TRNB. She completed and signed the application two days later and returned it to TRNB. This occurred two weeks before she resigned from her former position. The employment application provides that the declarant "understand[s] and agree[s] that [her] employment is for no definite period and may, regardless of the date of payment of [her] wages and salary, be terminated at any time without previous notice." Moreover, Fisher, who negotiated with Pickett, testified in his deposition that he and Pickett never discussed the tenure of her employment or the conditions of discharge, and Pickett's deposition testimony does not dispute Fisher's testimony on that point. There is simply nothing in this record from which a fact-finder could conclude that an agreement had been reached between Pickett and TRNB that she could not be reassigned. We conclude, therefore, there is no genuine issue of fact concerning TRNB's and Fisher's intention that Pickett's employment as mortgage department manager was terminable at any time. *See Choate v. TRW, Inc.,* 14 F.3d 74, 76–77 (D.C.Cir.1994).

█ We next turn to whether the motions judge correctly concluded, on these undisputed facts, that TRNB was entitled to summary judgment as a matter of law. Gen-

erally, there is a presumption that employment for an unspecified time is terminable at will. *Sorrells v. Garfinkel's Brooks Bros., Miller & Rhoads, Inc.,* 565 A.2d 285, 289 (D.C.1989) (citations omitted). This presumption, however, may be rebutted by "evidence that the parties intended employment to be for a fixed period." *Sullivan v. Heritage Found.,* 399 A.2d 856, 860 (D.C.1979). "Where the intent is not clearly revealed by the express terms of the agreement, the courts will look to evidence of surrounding circumstances to determine what was in the minds of the contracting parties." *Littell v. Evening Star Newspaper Co.,* 73 App.D.C. 409, 410, 120 F.2d 36, 37 (1941) (footnote omitted). *See also Sullivan, supra,* 399 A.2d at 860 ("Such an intention may be gleaned from the facts and circumstances of the case and the conduct of the parties.") (citation omitted).

█ In holding that employment for a fixed period was not contemplated by the parties, the *Littell* court set forth the following test:

> If it is their purpose, the parties may enter into a contract for permanent employment—not terminable except pursuant to its express terms—by stating clearly their intention to do so, even though no other consideration than services to be performed is expected by the employer or promised by the employee.... [W]here no such intent is clearly expressed and, absent evidence which shows other consideration than a promise to render services, the assumption will be that—even though they speak in terms of "permanent" employment—the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party.

*Littell, supra,* 73 App.D.C. at 410, 120 F.2d at 37. Here, the parties' intention is unambiguously stated in the employment application: the employee "understand[s] and agree[s] that [her] employment is for no definite period and may, regardless of the date of payment of [her] wages and salary, be terminated at any time without previous notice." Based on that provision, the mo-

tions judge could conclude as a matter of law that the parties had agreed that Pickett's employment could be terminated at any time.

Pickett argues, nonetheless, that the statements made to her by Fisher during her interview, and those contained in the letter of June 28, 1989, coupled with her resignation from her former position, where she had been recently promoted, and the fact that she began setting up the mortgage department before the bank opened for business, without additional remuneration generated by loans originated and closed, constitute sufficient "surrounding circumstances" to establish that the position was to be for a fixed period. Pickett testified in her deposition that before accepting the position at TRNB, Fisher told her "the job was—would be a stable one and there would be a long term, you know, possibility for growth and opportunity." The written offer states "[w]e welcome you to the TRNB Family and look forward to a long and mutually beneficial relationship together." Pickett maintains she resigned her former position based on assurances, as evidenced by those comments, that her position at TRNB was for a fixed period.

■ In support, Pickett relies principally on *Hodge v. Evans Fin. Corp.*, 228 U.S.App. D.C. 161, 164, 707 F.2d 1566, 1569 (1983), *aff'd as modified*, 823 F.2d 559 (1987) (*superceding* 250 U.S.App.D.C. 173, 778 F.2d 794 (1985)), where the United States Court of Appeals for the District of Columbia Circuit, reversing summary judgment in favor of an employer, observed that in determining the parties' intent the trial court should consider evidence of surrounding circumstances, including an employee's willingness to leave a secure position, relocate his family, and accept employment at a lower rate of remuneration. Pickett's reliance on *Hodge*, however, is misplaced. In *Hodge*, the employer gave *stronger* assurance of permanent employment than those given by TRNB in the instant case. Moreover, there was no written agreement relating to the termination of Hodge's employment like that in TRNB's employment application. Here, the employ-

ment application clearly reflects the parties' intent that the employment could be "terminated at any time," and none of the alleged representations made to Pickett by TRNB officers were to the contrary. We conclude, therefore, that the motions judge was not required to examine the surrounding circumstances since the parties' intent is "clearly revealed by the express terms" of the employment application. *Littell, supra,* 73 App. D.C. at 410, 120 F.2d at 37. Thus, *Hodge* provides no support for Pickett's claim that by granting TRNB's and Fisher's summary judgment motion she was deprived of an opportunity to present facts that would establish that the agreement was not for employment at will.[15]

## 2. The Promissory Estoppel Claim

Pickett also contends TRNB promised her the position of mortgage department manager for a fixed period and, as a result of her detrimental reliance on that promise, the FDIC should be estopped from denying the existence of a permanent employment contract.

■ In order to find a party liable on a theory of promissory estoppel, there must be evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee. *See Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C.1979) (citation omitted). "[D]emonstration of a promise is a prerequisite to invocation of the doctrine of promissory estoppel." *United States Jaycees v. Bloomfield,* 434 A.2d 1379, 1384 (D.C. 1981) (citing *Bender, supra,* 404 A.2d at 195). Since Pickett offered no evidence of a promise addressing the conditions of discharge or the term of employment, we need go no further than the first element. *See Bender, supra,* 404 A.2d at 196.

■ Viewing the record in the light most favorable to Pickett, we conclude there is no genuine factual issue regarding whether TRNB and Fisher promised Pickett a permanent position. The language of the employ-

---

**15.** For similar reasons, we conclude that Pickett's reliance on *Riefkin v. E.I. Du Pont de Nemours & Co.*, 53 App.D.C. 311, 290 F. 286 (1923), and *Nickens v. Labor Agency of Metro. Washington,* 600 A.2d 813 (D.C.1991), is also misplaced.

ment application and Fisher's uncontradicted testimony, that the terms and conditions of Pickett's employment were not discussed, negate any inference of a promise of employment for a fixed period as the mortgage department manager. Furthermore, the motions judge found, with respect to the letter offering employment, that there was "no jury question on whether defendants promised the Mortgage Manager position for a specific period of time or promised that it would not be modified without just cause. Plaintiff's evidence presents to the court only the words of an employer who is coloring the future of his business as brightly as possible."

We hold on this record that the motions judge could conclude as a matter of law that TRNB and Fisher should not be estopped from asserting that there was no promise of employment for a fixed period. *See United States Jaycees, supra,* 434 A.2d at 1384; *see also Choate, supra,* 14 F.3d at 77–78 (employer's statement " '[t]he topic [of the employee's book] sounds wonderful, and I have no problems with it' " was not a promise that employment would continue even in the face of negative reaction by employer's clients upon publication). Therefore, we need not address Pickett's contention that she reasonably relied on the purported promise of permanent employment as the mortgage department manager.[16]

In sum, the only evidence offered by Pickett are statements of her own expectations of the position at TRNB. An employee's subjective belief that her employment is not terminable at will is not controlling because "[m]ore than conclusive allegations in the pleadings or appellant['s] belief in the permanence of employment are necessary to raise a material issue of fact precluding the grant of summary judgment." *Sullivan, supra,* 399 A.2d at 859 (citation omitted). We hold, therefore, that there was no issue of fact regarding the parties' intent and that the motions judge did not err in granting summary judgment in No. 91–CV–1359.

16. Because we conclude that Pickett's claims are without merit, we do not reach the FDIC's contention that the claims are barred by the federal

Accordingly, we affirm the grant of summary judgment in both appeals.

*So ordered.*

common law doctrine enunciated in *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).