James H. MOSHOVITIS,
et al., Appellants,

v.

THE BANK COMPANIES,
et al., Appellees.

No. 95–CV–1572.

District of Columbia Court of Appeals.

Argued Feb. 18, 1997.
Decided May 8, 1997.

Leonard C. Collins, La Plata, MD, for appellants.

Robert E. Greenberg, Washington, DC, with whom Glenn W.D. Golding was on the brief, for appellee The Bank Companies.

Jeffery S. Jacobovitz, Washington, DC, with whom Jody Goodman was on the brief, for appellee J.P. King Auctioneers, Inc.

Peter R. Kolker, Washington, DC, for appellee Sonnenblick–Goldman Company.

Herbert A. Rosenthal, Washington, DC, for appellee Ren Parties.

Before FARRELL, KING, and RUIZ, Associate Judges.

KING, Associate Judge:

In this appeal we are asked to determine whether it was error, in the principal claim, for the trial judge to award a procuring cause broker a commission arising from an implied-in-fact contract in a real estate transaction, and whether the motions judge erred

in granting summary judgment in favor of third-party defendants. We affirm the judgment entered by the trial judge on the principal claim, but we reverse the grant of summary judgment.

## I.

In the spring of 1993, appellants James H. Moshovitis, Zoe Moshovitis, Paul Loukas, Linda Loukas, George Liapis, and Stratton Liapis (collectively "Moshovitis") owned a building at 1827–1829 M Street, N.W. ("property"). In mid-May, Moshovitis entered into a contract with appellees J.P. King Auctioneers, Inc. and Sonnenblick–Goldman Company (collectively "Auctioneers") for the sale of the property by auction ("auction contract"). The auction contract included a provision granting Auctioneers the exclusive right to sell the property at any time prior to the date of the auction, and, if the property was not sold at the auction, for ninety days thereafter. The auction took place on August 17, 1993, but Auctioneers was unable to sell the property at that time.

During the summer of 1993, Harry Schnipper, an independent contractor with appellee The Bank Companies ("TBC"), began working with appellees Joyce Wu, Jiaqi Ren, and Shao Sheng Ren (collectively "Rens") to locate property for purchase or lease which the Rens planned to use for a restaurant. Schnipper researched several potential sites, and toured a number of them with the Rens. On or about September 21, 1993, Schnipper, in pursuit of property for the Rens, contacted James H. Moshovitis concerning a site on K Street, N.W., and inquired whether it was available for lease. Moshovitis informed Schnipper that the K Street site was unavailable, but that Moshovitis owned the M Street property and that it was for sale. Schnipper and Mr. Moshovitis arranged a tour of the M Street property for the Rens.

The parties toured the property on October 7, 1993, and Schnipper thereafter delivered to Moshovitis, on behalf of the Rens, a letter of intent to purchase the property. Specifically the letter set forth a proposed purchase price of $900,000, with a commission of six percent of the gross sales price to be paid to TBC, should the Rens purchase the property.

On October 8, 1993, Schnipper, Mr. Moshovitis, and the Rens met to discuss the sale of the property. Although no deal was consummated at that meeting, the negotiations continued over the next few days until October 11, 1993, when Schnipper presented Mr. Moshovitis with a written offer to purchase the property for $1,000,000; the written offer included a provision that TBC would receive a six percent commission on the sale. Between October 11 and October 13, 1993, the parties exchanged counter-offers. On October 13, 1993, Moshovitis signed a written contract to sell the property to the Rens for $1,200,000 ("October contract"); this contract included a provision for TBC's six percent commission. The next day, in a conversation with Ann Ballard, an agent for Auctioneers, Schnipper learned, for the first time, about the auction contract between Moshovitis and Auctioneers. On the same day of his conversation with Ballard, Schnipper received a letter from Moshovitis rescinding the contract he had signed the previous day. During a subsequent conversation, Moshovitis told Schnipper that he rescinded the contract because the Moshovitis parties could not agree on the terms of the sale. In a letter dated October 14, 1993, Schnipper acknowledged the Moshovitis's rescission and he also informed Mr. Moshovitis that Schnipper would be out of town for a few days.

Moshovitis then proceeded to contact the Rens directly, and negotiations over the property resumed. These negotiations, conducted without the participation of Schnipper or TBC, led to a second written contract on November 29, 1993, ("November contract") between the Rens and Moshovitis on the sale of the property, for $1,200,000. Although the November contract contained a commission provision, it did not state, as the October contract had done, that either Schnipper or TBC were entitled to a commission under the contract. The commission clause read:

> If and only if settlement is made hereunder, the Seller [Moshovitis] agrees to pay [Auctioneers], his agent, a commission amounting to three [and] one-half (3½%) percent of the purchase price. This com-

mission shall be the only commission owed by seller. [Auctioneers], as listing broker, shall have the sole duty to co-op with the procuring cause broker and divide the commission. Purchasers [Rens] to be responsible for any other commission.

Moshovitis paid Auctioneers its commission pursuant to this commission clause.[1]

After learning of Auctioneers's role in the sale of the property, the fact that J.P. King, Inc. did not have a District of Columbia real estate license, and the existence of the November contract, TBC, which considered itself to be the procuring cause broker, threatened to sue Auctioneers for tortious interference, on the ground that Auctioneers had interfered with TBC's contractual relations with the Moshovitis parties. On January 18, 1994, TBC and Auctioneers entered into a settlement agreement, wherein Auctioneers paid TBC $30,000. The pertinent language of the settlement agreement reads: "[Auctioneers] agree[ ] to pay and TBC agrees to accept as full satisfaction of any and all claims it may have against [Auctioneers], the sum of Thirty Thousand Dollars ($30,000.00)."

## II.

On January 31, 1994, TBC filed the instant action against Moshovitis alleging breach of the October contract and breach of an implied-in-fact contract for brokerage services arising from TBC's procuring the Rens as ready, willing, and able buyers for the property. TBC sought the six percent commission it claimed it was owed pursuant to the October contract, or by an implied-in-fact contract for procuring a buyer for the property.

On June 7, 1994, Moshovitis filed its answer to TBC's complaint along with a third-party complaint against Auctioneers and the Rens. The third-party complaint against Auctioneers alleged that, pursuant to the November contract and in the event Moshovitis

was found liable for TBC's six percent commission, Auctioneers had breached its duty to split the commission it received from Moshovitis with "the procuring cause broker," TBC. The third-party complaint against the Rens alleged that the Rens breached their duty to pay "any other commission." Auctioneers moved for summary judgment, based on its settlement agreement with TBC, contending that the settlement resolved any claim for a portion of the commission that TBC had against Auctioneers. Judge Mitchell–Rankin, agreeing with Auctioneers's contention, ruled that the settlement agreement between Auctioneers and TBC was an accord and satisfaction, and that Moshovitis was neither a party to nor a beneficiary of the settlement agreement; she therefore granted Auctioneers's motions for summary judgment.

Thereafter a bench trial involving Moshovitis, TBC, and the Rens took place before Judge Henry H. Kennedy, Jr. Moshovitis presented three alternative theories in support of its claims. Specifically Moshovitis asserted: 1) that TBC could not receive a commission on the sale of the property because there was no written listing agreement, pursuant to D.C.Code § 45–1945 (1990),[2] between TBC and Moshovitis; 2) that it had not otherwise agreed to pay a commission to TBC; and 3) that if it was found liable to TBC for a commission, the Rens were obligated to pay it under the terms of the November contract. Judge Kennedy ruled that the absence of a written contract did not bar TBC from recovering a commission it was otherwise entitled to receive. The trial judge also found that TBC, through its agent Schnipper, had procured the Rens as a ready, willing, and able buyer to purchase the property; that there was no material difference between the October and November contracts; that the October contract was rescinded in bad faith; that an implied-in-fact contract arose between TBC, as procuring cause broker, and Moshovitis, as seller; that TBC's six percent commission had sur-

1. A commission, at three and one-half percent (3½%) of the sale price of $1,200,000, is $42,000. Although the record is not entirely clear on the point, apparently some expenses were subtracted from that amount and Auctioneers netted approximately $35,000.

2. "A written listing contract is required in the District for the sale of all real property." D.C.Code § 45–1945.

vived Moshovitis's rescission and counter-offers; and that the Rens relied in good faith on an oral representation by Mr. Moshovitis, whom the court deemed a "sophisticated" business man, when he implied that the commission clause in the November contract did not obligate the Rens to pay any commission owing from that contract. Based on these findings, the court ruled that an implied-in-fact contract existed between TBC as procuring cause broker and Moshovitis as sellers, and that TBC was entitled to its six percent commission ($72,000) according to the sales price in the November contract ($1,200,000). The trial judge also ruled that the Rens were not liable for any part of the judgment.[3]

Moshovitis appeals, contending that section 45–1945 requires a written listing contract before a commission can be paid to a procuring cause broker, that the trial court erred in ruling that Moshovitis had agreed to pay a commission to TBC, and that, if this court holds otherwise on these two points, the trial court erred when it failed to give any credit on the judgment award for the commissions it had already paid to Auctioneers. Moshovitis also appeals the grant of summary judgment to Auctioneers by the motions court, asserting that there were material issues in dispute concerning the settlement agreement between Auctioneers and TBC and whether the settlement encompassed only the TBC tort claim, or whether it also included some or all of the commission. Moshovitis argues that, if the trial court award of $72,000 is upheld, it is entitled to a credit to the extent that the settlement amount represents a commission split between Auctioneers and TBC.

For the reasons set forth below, we affirm the trial court's judgment in favor of TBC against Moshovitis for the six percent commission on the November contract, but we reverse the grant of summary judgment by the motions court for Auctioneers.

### III.

■ We turn first to the trial court's ruling in favor of TBC against Moshovitis.

We conclude that Moshovitis's contentions are without merit and can be disposed of without extensive discussion. We begin our analysis by noting that we review *de novo* a trial court's conclusions of law. *Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 89 (D.C.1994); *Westbridge Condominium Ass'n v. Lawrence*, 554 A.2d 1163, 1166 (D.C.1989). In *Fred Ezra Co. v. Pedas*, 682 A.2d 173 (D.C.1996), decided after Moshovitis's main brief was filed, we held that "[section] 45–1945 does not bar the enforcement of unwritten implied-in-fact contracts to pay a real estate commission." *Id.* at 178 (footnote omitted). Moshovitis conceded at oral argument that *Pedas* is controlling against him on this issue and we agree. Accordingly, the trial court did not err when it ruled that the absence of a written contract, by itself, did not bar TBC from receiving a commission.

■ The trial judge found that Moshovitis rescinded the October contract in bad faith in an attempt to escape having to pay two separate commissions, one to Auctioneers under the auction contract for three and one-half percent of the gross sales price, and the second to TBC under the October contract for six percent of the gross sales price. The day after rescinding the October contract, instead of walking away from the deal, Moshovitis contacted the Rens directly to resume negotiations over the property, this time without TBC's involvement. Moshovitis and the Rens eventually came to an agreement, and the November contract was executed. However, as the trial judge also found, there was no material difference between the rescinded October contract and the executed November contract, except that the latter contract excluded TBC's six percent commission. In short, the judge found that TBC had procured a ready, willing, and able buyer for Moshovitis's property, and Moshovitis's rescission of the October contract was merely a pretext to escape TBC's six percent commission. These findings by the trial judge

3. Although Moshovitis filed a notice of appeal of the judgment in favor of the Rens, that appeal was later withdrawn. Counsel for the Rens, however, entered an appearance in this court and filed a brief, but elected not to participate in oral argument. As the appeal has been withdrawn, we do not address the trial court's ruling in favor of the Rens.

are supported by the record and are not clearly erroneous. *Butler v. Whitting,* 647 A.2d 383, 384 (D.C.1994). Therefore, the trial judge did not err in concluding that TBC was entitled to receive a six percent commission from Moshovitis.

## IV.

■ We next consider whether the trial court properly granted summary judgment in favor of Auctioneers against Moshovitis. Summary judgment should be granted only where there is no genuine issue regarding any material fact and where the movant is entitled to judgment as a matter of law. *R & A, Inc. v. Kozy Korner, Inc.,* 672 A.2d 1062, 1070 (D.C.1996); *McCoy v. Quadrangle Dev. Corp.,* 470 A.2d 1256, 1258 (D.C.1983). This court conducts a *de novo* review of the record when reviewing a grant of summary judgment, and we apply the same principles as the trial court when it initially considered the motion. *Simard v. Resolution Trust Corp.,* 639 A.2d 540, 549 (D.C.1994); *Holland v. Hannan,* 456 A.2d 807, 814 (D.C.1983).

In this case the propriety of the grant of summary judgment depends upon an interpretation of the settlement agreement between Auctioneers and TBC. Although the settlement agreement may have been explicit in settling the claims and obligations of Auctioneers and TBC *inter se,* it by no means resolves on its face the issue of whether Auctioneers complied with its duty to Moshovitis under the commission clause. Moreover, reviewing the record before us, we conclude that there exists a material dispute concerning the coverage of the settlement agreement on the question whether the $30,000 Auctioneers paid TBC was intended to include any compensation for some or all of TBC's share of the commission which Auctioneers received from Moshovitis pursuant to the November contract.

This disputed issue is strikingly illustrated by two sworn, but contradictory, statements which were submitted by the parties in their respective filings on the motion for summary judgment. First, an officer for Auctioneers submitted an affidavit, appended to the motion for summary judgment, stating that the settlement agreement was intended to "resolve *all* disputes" between Auctioneers and TBC, including TBC's "claim for a share of the commission from [the November contract]." On the other hand, Moshovitis submitted, with his opposition to the motion for summary judgment, an interrogatory answer given by an officer of TBC which states: "[t]he payment [TBC] received from [Auctioneers] was for settlement of a claim against [Auctioneers] for tortious interference with prospective advantage. . . . [TBC] has not received any payment as the commission it earned for procuring a purchaser of the Property." Clearly, the resolution of this disputed fact is material to the determination of whether Auctioneers had satisfied its contractual obligations under the commission clause contained in the November contract. To the extent the court concludes that the settlement between Auctioneers and TBC includes a sum attributable to commission, Moshovitis is entitled to a credit, in that amount, on the judgment against it in favor of TBC.[4] Therefore, we reverse the grant of summary judgment by the motions judge in favor of Auctioneers.

## V.

In conclusion, we affirm the trial court's ruling that TBC is entitled to recover a six percent commission from Moshovitis. Also, because there exists a genuine issue of material fact concerning the settlement agreement between TBC and Auctioneers for the reasons stated above, the grant of summary

---

**4.** We cannot decide the issue regarding credit because the trial court must first resolve the dispute between Moshovitis and Auctioneers. In its third-party complaint against Auctioneers, Moshovitis sought "recovery . . . against [Auctioneers] for any sum that [Moshovitis is] required to pay to [TBC]." Recovery from Auctioneers would be based on the contract provision that requires Auctioneers to divide the commission it received from Moshovitis with the procur-

ing cause broker. On remand the trial court must determine whether Moshovitis is entitled to recover from Auctioneers any or all of the commission ear-marked for the procuring cause broker. If the trial court concludes that Moshovitis should recover a sum attributable to commission from Auctioneers, the court then must reduce, by that amount, the sum awarded by it to TBC from Moshovitis in order to avoid double recovery.

judgment in favor of Auctioneers is reversed. On remand the trial court must determine whether the settlement agreement included any commission from the November contract; and, if so, the amount. The sum so determined should then be credited in the award to TBC from Moshovitis.

*Affirmed in part and reversed in part.*